**UNITED STATES of America, Appellee,**

v.

**Reginald GLOVER, Defendant–
Appellant.**

No. 300, Docket 91–1339.

United States Court of Appeals,
Second Circuit.

Argued Oct. 31, 1991.

Decided Feb. 18, 1992.

Herbert L. Greenman, Buffalo, N.Y. (Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, of counsel), for defendant-appellant.

Thomas S. Duszkiewicz, Asst. U.S. Atty., W.D.N.Y., Buffalo, N.Y. (Dennis C. Vacco, U.S. Atty., W.D.N.Y., of counsel), for appellee.

Before OAKES, Chief Judge, LUMBARD and ALTIMARI, Circuit Judges.

ALTIMARI, Circuit Judge:

Defendant-appellant Reginald Glover appeals from a judgment of conviction, entered in the United States District Court for the Western District of New York (Richard J. Arcara, *Judge*), finding him guilty of possession with the intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1988).

The contraband forming the basis of Glover's conviction was recovered from his luggage after an encounter between Glover and members of a Drug Enforcement Administration ("DEA") Task Force at the Niagara Frontier Transit Authority ("NFTA") bus terminal in Buffalo, New York. On appeal, Glover contends that his conviction should be reversed because the district court erred in concluding that his Fourth Amendment rights were not violated during the encounter and, consequently, in denying his motion to suppress the narcotics recovered from his suitcase. Specifically, Glover argues that the officers had no objective level of suspicion to justify

seizing him or his bags, thereby tainting the evidence found during the subsequent consensual search of his luggage.

For the reasons set forth below, we affirm the judgment of the district court.

## BACKGROUND

For approximately the past one and one-half years, Investigator Paul Terranova of the Erie County Sheriff's Department and Agent William Spencer of the United States Border Patrol have been members of a DEA Task Force that enforces drug, immigration, and currency laws at the NFTA bus terminal and at other transportation centers in Buffalo. As part of their duties, Task Force members regularly observe passengers arriving on the early morning express bus from New York City. Interest in this particular bus is not accidental. As this Court previously has observed, "New York City is the principal source for drugs sold in western New York," *United States v. Montilla*, 928 F.2d 583, 584 (2d Cir.1991), and the express bus is used by drug traffickers to transport narcotics to the Buffalo area. *See United States v. Torres*, 949 F.2d 606, 607 (2d Cir.1991); *Montilla*, 928 F.2d at 584. Indeed, the Task Force's questioning of select express bus passengers yields approximately three to four arrests per month. *Montilla*, 928 F.2d at 584–85.

On May 16, 1990, Terranova and Spencer were on patrol at the NFTA bus terminal when the morning express bus arrived from New York City and parked at Gate 5. All of the passengers disembarked the bus and entered the terminal through Gate 5, except defendant-appellant Glover, who entered through Gate 4. Because Glover had separated himself from the main flow of traffic, Terranova and Spencer continued to observe him. They noticed that Glover appeared nervous, continually looked over his shoulders, and, though outside on a somewhat cool day, was the only passenger sweating from his face and brow. As he entered the terminal building carrying his two unchecked bags (a shoulder bag and a small suitcase), Glover walked extremely slowly and continually scanned the entire terminal area in a jerky fashion that Terranova believed was calculated to detect possible surveillance. Glover proceeded in this manner toward the terminal exit.

At that point, as a result of his observations, Terranova approached Glover, identified himself as a police officer, and asked if he could question Glover. Glover agreed to be questioned. During the subsequent questioning, Spencer stood silently several feet behind Terranova. Terranova began by asking Glover for identification. In response, Glover reached into his sock, retrieved his wallet, and handed Terranova a handwritten employee identification card. After asking Glover his name, Terranova requested additional identification. Glover produced a photocopied Social Security document with an illegible number. Terranova noticed that the identification Glover provided contained two different addresses.

Terranova then asked Glover why he was visiting Buffalo. Glover answered that he was in town to pay a surprise visit to his aunt. Because of the nature of the identification Glover provided—one handwritten, one illegible, and each with a different address—Terranova asked if he could phone Glover's aunt to confirm his identification. Glover refused, stating that the phone call would ruin the surprise. Glover also refused to allow Terranova to phone his employer, explaining that his employer wrongly believed that Glover had taken a sick day. Throughout this encounter with Terranova, Glover was sweating heavily, shaking nervously, and continually looking toward the exit.

Terranova then told Glover that he was concerned with drug smuggling in the Western New York area and asked Glover if he was carrying narcotics. Glover responded that he was not. Glover then refused Terranova's request to search his bags, stating that Terranova did not have "probable cause" to search his luggage. While still holding Glover's identification, Terranova asked if Glover would accompany him to the NFTA office for a further check on his identification. Glover agreed to go.

When Glover, Terranova, and Spencer arrived at the NFTA office, which was located approximately thirty feet from the terminal exit, Glover was asked, among other things, his birth date and whether he had a criminal history. Glover stated that he was born on November 3, 1968, and that he had no criminal history. Within minutes, a computer check of Glover's identification revealed that Glover's birthday was November 2, and that he had a criminal history of narcotics-related arrests and had used aliases. When asked to explain why he had lied regarding his criminal history, Glover responded that he believed Terranova's question pertained only to crimes in the Buffalo area.

At that point, Glover again refused a request to have his bags searched. Terranova then informed Glover that his bags would be detained until a narcotics detection dog arrived to conduct a "sniff test." Another agent present in the office told Glover that, although his bags would be detained, he was free to leave. The agent also told Glover that if the dog reacted positively to the bags, the officers would apply for a search warrant. Glover immediately refused to leave, insisting that he wanted to remain to make sure the officers obtained a warrant.

When the narcotics dog arrived, approximately thirty minutes had elapsed from the time Terranova had asked Glover to go to the NFTA office. In a controlled inspection involving several different pieces of luggage, the dog "hit on" Glover's bags. Once informed of the dog's reaction, Glover picked up his shoulder bag, threw it onto a desk, and told the officers to search it. After confirming that Glover wanted the bag searched, Terranova examined its contents and discovered a package containing a quantity of marijuana. At that point, Task Force Investigator June Bradley, who had entered the office, asked Glover if she could search his other bag. Glover responded "[y]ou might as well look in that one too." After opening the bag, Bradley discovered a package containing a white powder that was subsequently determined to be cocaine. Glover was then arrested and subsequently charged with one count

of possessing with the intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1).

In district court, Glover moved to suppress the marijuana and cocaine, arguing that the search of his luggage was undertaken following an encounter with the police that violated his Fourth Amendment rights. After a suppression hearing, Judge Arcara first concluded that the initial encounter between Glover and the officers was entirely consensual. The District Judge further found that by the time the officers seized Glover's bags in the NFTA office by holding them for a "sniff test," they clearly "had reasonable suspicion based on articulable facts that [Glover] was carrying contraband." Finally, the court concluded that after the narcotics dog "hit on" Glover's bags, Glover voluntarily consented to the search that yielded the drugs. Accordingly, the district court denied Glover's motion to suppress. Glover subsequently entered a conditional plea of guilty, reserving his right to appeal the denial of his suppression motion. This appeal followed.

## DISCUSSION

■ In considering a district court's ruling on a suppression motion, this Court reviews the district court's factual findings under a "clearly erroneous" standard, *see, e.g., United States v. Springer,* 946 F.2d 1012, 1015 (2d Cir.1991); *United States v. Hooper,* 935 F.2d 484, 489 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991); *United States v. Montilla,* 928 F.2d at 588, construing all of the evidence in the light most favorable to the government. *See, e.g., United States v. Villegas,* 928 F.2d 512, 517 (2d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 137, 116 L.Ed.2d 104 (1991); *United States v. Jackson,* 652 F.2d 244, 246 (2d Cir.), *cert. denied,* 454 U.S. 1057, 102 S.Ct. 605, 70 L.Ed.2d 594 (1981). "We review *de novo* questions of law such as whether a seizure occurred and, if so, whether reasonable suspicion justified it." *Springer,* 946 F.2d at 1015; *see also Hooper,* 935 F.2d at 489; *Montilla,* 928 F.2d at 588.

■ Our analysis begins with some preliminary observations. As we stated in *Hooper,* there are three types of encounters between police and individuals, each with different ramifications under the Fourth Amendment. *See* 935 F.2d at 490. The first type is a consensual encounter whereby an individual willingly agrees to speak to law enforcement personnel. *See id.* Such contact may be initiated by the police without any objective level of suspicion and does not, without more, amount to a "seizure" implicating the Fourth Amendment's protections. *See id.; see also Florida v. Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991); *Springer,* 946 F.2d at 1016; *United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990). Discussing the parameters of such consensual encounters, the Supreme Court recently observed in *Bostick* that "even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual ...; ask to examine the individual's identification ...; and request consent to search his or her luggage ... as long as the police do not convey a message that compliance with their requests is required." 111 S.Ct. at 2386 (citations omitted).

■ The second type of encounter, based on the principles enunciated in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), involves a limited investigative stop of an individual and/or his or her bags. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983); *see also Hooper,* 935 F.2d at 490, 492–93. Although limited in scope, such investigative detentions are "seizures" under the Fourth Amendment, *see, e.g., Hooper,* 935 F.2d at 490, and must be based on "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884). The third and final type of encounter is an arrest—plainly a Fourth Amendment "seizure"—that must be based on probable cause.

*See, e.g., Hooper,* 935 F.2d at 490; *United States v. Bradley,* 923 F.2d 362, 364 (5th Cir.1991).

■ To determine whether a "seizure" has occurred triggering the Fourth Amendment's protections, a court must consider "'if, in view of all of the circumstances surrounding the [encounter], a reasonable person would have believed that he [or she] was not free to leave.'" *Lee,* 916 F.2d at 819 (quoting *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, *J.*))); *see also Bostick,* 111 S.Ct. at 2389. The test is an objective one, *see, e.g., Springer,* 946 F.2d at 1016; *Lee,* 916 F.2d at 819, based on how a reasonable innocent person would view the encounter. *Bostick,* 111 S.Ct. at 2388. As a guide to applying this test, we have enumerated certain factors that might suggest that a seizure occurred, namely:

> the threatening presence of several officers; the display of a weapon; the physical touching of the person by the officer; language or tone indicating that compliance with the officer was compulsory; prolonged retention of a person's personal effects, such as airplane tickets or identification; and a request by the officer to accompany him to the police station or a police room.

*Lee,* 916 F.2d at 819; *see also Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (opinion of Stewart, *J.*); *Springer,* 946 F.2d at 1016.

In the present case, applying the applicable legal standard, the district court found that Glover's bags were seized when, once in the NFTA office, Terranova told Glover that his bags would be detained pending the arrival of a narcotics dog. Until that point, the court found that the entire encounter was consensual. The district court raised, but did not decide, the issue of whether Glover was also seized at that point, despite being told that he was free to leave. Rather, the court observed that whether Glover was seized was not pertinent because the same standards applied in

determining the constitutionality of detaining him as well as his bags. Moreover, the court found that the investigative detention of Glover and his bags was supported by reasonable suspicion that he was carrying narcotics. Challenging the court's conclusions, Glover contends that the seizure occurred earlier, when Terranova, still retaining Glover's identification, asked Glover to accompany him to the NFTA office for further questioning. According to Glover, the officers did not then, or at any other time during the encounter, have reasonable suspicion to justify a *Terry*-type investigative detention of him or his bags.

■ Initially, we note that prior to the time Terranova asked Glover to return to the NFTA security office, the encounter was consensual. Although accompanied by Spencer, Terranova alone approached Glover in a public place, identified himself as a police officer, and, in a non-threatening manner, asked Glover certain questions, requested identification, and asked whether Glover would consent to have his bags searched for narcotics. No weapons were displayed and there was no physical contact between the officers and Glover. Under these circumstances, it is plain that no seizure had occurred. *See, e.g., Bostick*, 111 S.Ct. at 2386, 2388; *Springer*, 946 F.2d at 1016–17; *Hooper*, 935 F.2d at 492; *Lee*, 916 F.2d at 819.

■ However, when Terranova requested Glover to leave the public area of the terminal and to return to the NFTA security office for further questioning, without returning Glover's identification and without telling Glover that he was free to leave, we believe that Glover and his bags were seized. *See Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (once "officers identified themselves as narcotics agents, told [defendant] he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, [defendant] was effectively seized"). Standing alone, Terranova's failure to advise Glover that he was free to

terminate the interview and leave would not turn an otherwise consensual encounter into a seizure. *See, e.g., Springer*, 946 F.2d at 1016. However, we believe that failure, combined with the failure to return Glover's identification and the request to accompany the officers to a police room, amounted to a seizure because under such circumstances, a reasonable person would not have felt free to leave. *Compare Royer*, 460 U.S. at 501–02, 103 S.Ct. at 1326 *with Torres*, 949 F.2d at 608 (request to accompany officers to police office, without more, did not establish seizure); *see also Lee*, 916 F.2d at 819 (factors which indicate a seizure occurred include an officer's retention of an individual's identification and a request to accompany the officer to a police office).

■ Our conclusion that a seizure occurred at that point in Glover's encounter with the officers does not, however, end our inquiry. Rather, we must consider whether there existed a reasonable suspicion that Glover was carrying narcotics to justify a limited detention of Glover and his bags and, if so, whether the officers' conduct exceeded the scope of a permissible investigative stop. *See Place*, 462 U.S. at 706–710, 103 S.Ct. at 2644–46; *Royer*, 460 U.S. at 498–500, 103 S.Ct. at 1325; *Hooper*, 935 F.2d at 492–94.

■ To justify a limited *Terry*-type investigative stop, a law enforcement officer must have a reasonable suspicion based on articulable facts that the suspect "is, has been, or is about to be engaged in criminal activity." *Villegas*, 928 F.2d at 516; *see also Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585; *Terry*, 392 U.S. at 30, 88 S.Ct. at 1884; *Hooper*, 935 F.2d at 493. Although the concept of reasonable suspicion is not susceptible to precise definition, *see, e.g., Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585; *Hooper*, 935 F.2d at 493, the requisite level of suspicion to make an investigative stop is "'considerably less than proof of wrongdoing by a preponderance of the evidence.'" *Villegas*, 928 F.2d at 516 (quoting *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585). Still, "[t]he Fourth Amendment requires 'some minimal level of objective

justification' for making the stop." *Soko-low*, 490 U.S. at 7, 109 S.Ct. at 1585 (quoting *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 1763, 80 L.Ed.2d 247 (1984)). Consequently, an officer's inchoate suspicion or mere hunch is insufficient to justify a *Terry*-type detention. *Sokolow*, 490 U.S. at 7, 109 S.Ct. at 1585 (citing *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883).

■ The standard for determining whether a particular stop was justified by reasonable suspicion is an objective one, *see, e.g., United States v. Salazar*, 945 F.2d 47, 49 (2d Cir.1991); *Villegas*, 928 F.2d at 516; *United States v. Nersesian*, 824 F.2d 1294, 1316 (2d Cir.), *cert. denied*, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987), not dependent on the intentions or motivations of the particular detaining officers. *See, e.g., Nersesian*, 824 F.2d at 1316. In the case of suspected narcotics trafficking, an officer's suspicion will be reasonable if, considering the totality of the circumstances surrounding the stop, "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer." *Villegas*, 928 F.2d at 516 (citation omitted); *see also United States v. Price*, 599 F.2d 494, 501 (2d Cir.1979).

In the present case, at the point when Terranova asked Glover to return to the NFTA security office, the district court found, among other things, that Glover was traveling to Buffalo from New York City, a "source city" of narcotics for western New York. In particular, he was traveling on the early morning express bus, which has been used by drug couriers to transport narcotics to the Buffalo area. *See Torres*, 949 F.2d at 607; *Montilla*, 928 F.2d at 584. As he exited the bus, Glover was sweating from his face and brow and was looking around nervously over his shoulders as he entered the NFTA terminal. Moreover, although all of the other

passengers on the bus entered the terminal through Gate 5, where the bus had parked, Glover separated himself from the mainstream and entered the terminal alone through Gate 4, some twenty to thirty feet away. As Glover entered the terminal, Terranova and Spencer observed that he walked in an extremely slow manner, continually scanning the entire terminal area in quick, jerky movements, apparently designed to detect possible surveillance.

After Terranova approached Glover, identified himself, and asked for identification, Glover produced from his sock two pieces of identification: one handwritten employee identification card and one photocopied Social Security document with a partially obliterated number. Each piece of identification bore a different address. When asked why he was in Buffalo, Glover responded that he was paying a surprise visit to his aunt. Glover refused to allow Terranova to contact his aunt to verify his identification, explaining that to do so would ruin his surprise. He also refused to allow Terranova to contact his employer because although Glover allegedly took a sick day, he was really on vacation. Moreover, throughout the encounter, Glover was sweating heavily and shaking nervously.

■ These factual findings are supported by the record and are not "clearly erroneous."[1] *See, e.g., Hooper*, 935 F.2d at 489; *Villegas*, 928 F.2d at 517. Glover essentially argues, however, that each of these facts, even if true, is innocuous and fails to support a finding of reasonable suspicion. We disagree. Even conduct seemingly innocent may form the basis for reasonable suspicion that criminal activity is afoot. *Sokolow*, 490 U.S. at 9, 109 S.Ct. at 1586 (citation omitted). Here, although each fact viewed separately may be consistent with innocent travel, we believe that Glover's overall conduct, viewed objectively

---

1. In support of its finding that there existed reasonable suspicion to detain Glover's bags, the district court also found that Glover was carrying a "large" unchecked suitcase as he exited the bus. This finding is "clearly erroneous" because testimony at the suppression hearing established that Glover's suitcase was "small." This error is harmless, however, *see* Fed.R.Crim.P. 52(a), because we do not rely upon that finding in determining whether reasonable suspicion existed in the instant case.

by an officer familiar with drug courier practices, *see, Villegas,* 928 F.2d at 516, gave rise to a reasonable suspicion that Glover was transporting narcotics, thereby warranting the detention of Glover and his bags for further investigation. *See Sokolow,* 490 U.S. at 9–10, 109 S.Ct. at 1586–87; *Mendenhall,* 446 U.S. at 560–61, 564–65, 100 S.Ct. at 1880, 1882 (Powell, *J.,* concurring); *Torres,* 949 F.2d at 608; *Springer,* 946 F.2d at 1017; *Hooper,* 935 F.2d at 493; *Lee,* 916 F.2d at 820.

■ Having determined that there existed reasonable suspicion to justify an investigative stop, we must next consider whether the officers' actual conduct fell within the permissible scope of a *Terry*-type detention. For an investigative stop based on reasonable suspicion to pass constitutional muster, the ensuing investigation must be reasonably related in scope and duration to the circumstances that justified the stop in the first instance, so as to be minimally intrusive of the individual's Fourth Amendment interests. *See Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575; *Place,* 462 U.S. at 706, 709, 103 S.Ct. at 2644, 2645; *Royer,* 460 U.S. at 500, 103 S.Ct. at 1325. If an investigative stop based on reasonable suspicion continues too long or becomes unreasonably intrusive, it will ripen into a *de facto* arrest that must be based on probable cause. *See Sharpe,* 470 U.S. at 685, 105 S.Ct. at 1575; *Hooper,* 935 F.2d at 494.

A critical factor in evaluating the intrusiveness of a stop is the length of the detention. *See, e.g., Sharpe,* 470 U.S. at 675–76, 105 S.Ct. at 1570; *Place,* 462 U.S. at 709, 103 S.Ct. at 2645; *Hooper,* 935 F.2d at 495. No bright-line rule exists, however, to determine the outer time limit of a permissible *Terry*-type stop. *See, e.g., Place,* 462 U.S. at 709, 103 S.Ct. at 2645. Rather, in considering the reasonableness of the duration of a particular detention, a court must "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575;

*see also Place,* 462 U.S. at 709, 103 S.Ct. at 2645. In making this inquiry, the Supreme Court has cautioned that a court should not " 'indulge in unrealistic second-guessing' as to the means law enforcement officers ... employ to conduct their investigations." *Hooper,* 935 F.2d at 497 (quoting *Sharpe,* 470 U.S. at 686, 105 S.Ct. at 1575); *see also United States v. Alexander,* 907 F.2d 269, 273 (2d Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 983, 112 L.Ed.2d 1067 (1991). "The question is not simply whether some ... alternative [method] was available, but whether the police acted unreasonably in failing to recognize or pursue it." *Sharpe,* 470 U.S. at 687, 105 S.Ct. at 1576; *see also Alexander,* 907 F.2d at 273. We observe further that the standards applicable to assessing the propriety of such *Terry*-type stops apply equally to the detention of individuals and/or their luggage or other personal effects. *See Place,* 462 U.S. at 708–09, 103 S.Ct. at 2645; *United States v. Sterling,* 909 F.2d 1078, 1084 (7th Cir.1990).

Relying principally on *Royer,* 460 U.S. at 503, 103 S.Ct. at 1327, Glover contends that his detention in the NFTA office was a *de facto* arrest. Glover also argues that the detention of his bags exceeded the permissible boundaries of the Fourth Amendment. We find these contentions unpersuasive.

In *Royer,* officers approached the defendant Royer, a suspected narcotics courier, in an airport, questioned him, obtained his airline tickets and identification, told him he was suspected of drug smuggling, and asked him to accompany them to a police room. Once in the room, the officers proceeded with their investigation and retrieved Royer's luggage from the airline without his consent, all without ever telling Royer that he was free to leave and catch his plane. In a plurality opinion, the Supreme Court held that under such circumstances, Royer was effectively under arrest. *See* 460 U.S. at 503, 103 S.Ct. at 1327. In support of this conclusion, the plurality scrutinized the means of investigation used by the agents and found that they were overintrusive under the circumstances. Among other things, the Court noted that the record reflected that no le-

gitimate law enforcement purposes were served by asking Royer to go to the security office. *Id.* at 505, 103 S.Ct. at 1328. In addition, the Court found that the officers could have, but failed to, use a narcotics dog to perform a "sniff test" on the defendant's bags, which could have resulted in only a momentary detention. *Id.* at 505–06, 103 S.Ct. at 1328–29. Although perhaps not dispositive, the Court buttressed its conclusion that Royer was subject to a *de facto* arrest by indicating that the State had conceded in the lower courts that Royer would not have been free to leave. *Id.* at 503, 103 S.Ct. at 1327.

We do not read *Royer* as establishing a *per se* rule that moving from an airport, bus, or train terminal to a police office during a *Terry*-type encounter, for purposes of further investigation, automatically converts an otherwise permissible stop into an impermissible arrest upon arrival at the office. *See, e.g., United States v. Knox,* 839 F.2d 285, 290–91 (6th Cir.1988), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989); *United States v. Borrero,* 770 F.Supp. 1178, 1190–91 (E.D.Mich.1991). Rather each case must be evaluated on its facts to determine whether a particular seizure is justified on grounds of reasonable suspicion. *See Sharpe,* 470 U.S. at 685–86, 105 S.Ct. at 1575; *see also Royer,* 460 U.S. at 506–07, 103 S.Ct. at 1329.

Under the circumstances of this case, we do not believe that Glover's detention ripened into a full-blown arrest. *Royer* is plainly distinguishable. First, unlike the officers in *Royer,* Terranova and Spencer had a legitimate law enforcement purpose in asking Glover to return to the NFTA office. Once there existed reasonable suspicion that Glover was engaged in narcotics activity, the officers were justified in conducting a computer check to verify the accuracy of his rather dubious and facially unreliable identification—a handwritten employment card and a photocopied Social Security document with an illegible number. In hindsight, it may be that they somehow could have verified Glover's identification without asking him to return to the office. However, considering the na-

ture of the identification, his refusal to allow them to verify the information with his aunt or his employer, and the other factors contributing to the existence of reasonable suspicion, we do not believe that the officers' chosen course of conduct was unreasonable. *See Sharpe,* 470 U.S. at 686–87, 105 S.Ct. at 1575–76; *see also Hooper,* 935 F.2d at 497.

Second, and more importantly, unlike the defendant in *Royer,* Glover was expressly told that he was free to leave the office, though his bags would have to be detained pending the dog's arrival. *See Dunaway v. New York,* 442 U.S. 200, 212, 99 S.Ct. 2248, 2256, 60 L.Ed.2d 824 (1979) (factor in determining whether suspect under arrest is whether he is told he is free to go). Rather than leave, however, Glover chose to remain in order to ensure that the officers obtained a warrant. At that point, Glover knew that a narcotics dog was on the way and that, depending on the dog's reaction, his detention could be over in "short order." *Royer,* 460 U.S. at 504, 103 S.Ct. at 1328. Although the officers still had Glover's identification and indicated that they would detain his luggage until the dog arrived, once Glover was told he was free to leave, he was, under the circumstances of this case, plainly not under arrest.

Not only was Glover not under arrest, but he was arguably no longer "seized" for Fourth Amendment purposes. While the officers failed to tell Glover specifically how to retrieve his luggage if he chose to leave—a practice we do not encourage, *see Place,* 462 U.S. at 708 & n. 8, 710, 103 S.Ct. at 2645 & n. 8, 2646—given Glover's reason for remaining, *i.e.,* to monitor the officers' conduct, we cannot say that their failure to instruct Glover on how to recover his luggage if the "sniff test" proved negative caused him to stay so as to effectively continue his seizure. Moreover, with regard to Glover's identification, we believe that, once told he was free to leave, a reasonable person under the circumstances would simply have requested the officers to return his identification.

Even assuming, however, that Glover remained seized under the Fourth Amendment, despite being told that he was free to leave, *see id.*, we do not believe that detaining him along with his bags until the arrival of the narcotics dog converted an otherwise permissible detention based on reasonable suspicion into an arrest requiring probable cause. Upon returning to the NFTA office, the officers' acted diligently and in a non-threatening manner to confirm or dispel their suspicions that Glover was engaged in narcotics trafficking. They promptly conducted a computer check to verify Glover's identification, and learned, contrary to Glover's representations, that he had prior narcotics convictions, had also used aliases, and had given an incorrect birthdate. Once Glover refused consent to search his bags, the officers immediately arranged for the narcotics dog, which arrived about twenty minutes later. Both the computer search and the dog sniff were minimally intrusive means of confirming or dispelling the officers' suspicion. *See Place*, 462 U.S. at 707, 103 S.Ct. at 2644 ("sniff test" minimally intrusive).

Moreover, calculated from the moment Glover and his bags were initially seized until the arrival of the narcotics dog, approximately thirty minutes had elapsed. Part of this time was used to clarify Glover's misrepresentations regarding his background. Given the officer's diligence in pursuing their investigation, and given the Government's substantial interest in drug interdiction, *see, e.g., Place*, 462 U.S. at 703, 103 S.Ct. at 2642 (citing *Mendenhall*, 446 U.S. at 561, 100 S.Ct. at 1880 (Powell, *J.*, concurring)); *Hooper*, 935 F.2d at 498, detaining Glover for approximately thirty minutes with his bags to conduct brief questioning and to await the arrival of the narcotics dog was a limited intrusion on Glover's Fourth Amendment interests wholly justified by reasonable suspicion. *See United States v. Mondello*, 927 F.2d 1463, 1471 (9th Cir.1991) (thirty minute detention of defendant and his luggage inside his private plane while drug agents arranged for narcotics dog to inspect defendant's luggage held reasonable); *Knox*, 839 F.2d at 290–91 (thirty minute detention in airport security office of defendants and their luggage followed by "sniff test" held reasonable); *Borrero*, 770 F.Supp. at 1189–91 (seventy minute detention in security office, due in part to necessity for translation, prior to performance of "sniff test" held reasonable); *cf. United States v. Sullivan*, 903 F.2d 1093, 1097–98 (7th Cir.1990) (forty-five minute detention of luggage for "sniff test" held reasonable).

Accordingly, we conclude that the officers' investigative stop of Glover and his bags was a permissible *Terry*-type detention founded on a reasonable suspicion that Glover was engaged in narcotics trafficking. Although we uphold the investigative stop of Glover and his bags on somewhat different grounds than those relied upon by the district court, it is well-settled that a reviewing court "may affirm 'on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court.'" *Chesley v. Union Carbide Corp.*, 927 F.2d 60, 68 (2d Cir.1991) (citation omitted).

Finally, once the narcotics dog "hit on" Glover's bags, the police had probable cause to obtain a search warrant. *See, e.g., Royer*, 460 U.S. at 506, 103 S.Ct. at 1329; *United States v. Waltzer*, 682 F.2d 370, 374 (2d Cir.1982), *cert. denied*, 463 U.S. 1210, 103 S.Ct. 3543, 77 L.Ed.2d 1392 (1983). Glover, however, consented to a search of his bags before a warrant was obtained. Although not challenged by Glover on appeal, we agree with the district court's conclusion that the warrantless seizure of the contraband from Glover's bags following the "sniff test" was proper because, under the totality of the circumstances, Glover's consent to the search was entirely voluntary. *See, e.g., United States v. Watson*, 423 U.S. 411, 424–25, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976); *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973); *Price*, 599 F.2d at 503.

## CONCLUSION

Based on the foregoing, the judgment of the district court is affirmed.

LUMBARD, Circuit Judge, concurring:

I concur in affirming the district court's denial of Glover's motion to suppress the drugs seized from two bags he carried off a bus upon arrival in Buffalo, New York.

On May 16, 1990, Investigator Paul Terranova observed Glover arrive on an overnight bus from New York, a means of travel for drug carriers that has recently come to our attention. *See United States v. Torres*, 949 F.2d 606 (2d Cir.1991); *United States v. Springer*, 946 F.2d 1012 (2d Cir.1991). Glover seemed nervous and was apprehensive about being observed. Terranova approached Glover, identified himself as an officer, and asked if Glover would answer some questions. Glover responded to questioning and produced a xerox of a social security card and a handwritten employment card.

This encounter was consensual and Terranova's conduct was entirely proper. "[A] simple request to speak with [a suspect] in the non-coercive atmosphere of a public place" does not constitute a seizure under the fourth amendment. *United States v. Montilla*, 928 F.2d 583, 590 (2d Cir.1991). Unless an officer " 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen' ... an encounter between a police officer and a citizen is consensual, and implicates no Fourth Amendment interest." *Springer*, 946 F.2d at 1016 (quoting *Florida v. Bostick*, — U.S. —, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991)). *See also United States v. Lee*, 916 F.2d 814, 819 (2d Cir. 1990) ("a police officer is free to approach a person in public and ask a few questions").

Upon request, Glover then accompanied Terranova to the NFTA Office for a computer check of his identification, and agreed to further questioning. There is no reason to believe that a person in Glover's position would have felt compelled to accompany Terranova into the Office or submit to further questioning. Consequently, Glover was not seized at this time.[1]

The Supreme Court has found that a seizure occurs "only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The Court applied this test in *Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983), finding that "when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment." Under those circumstances, the Court found that the police activity "surely amount[ed] to a show of official authority such that 'a reasonable person would have believed that he was not free to leave.' " *Royer*, 460 U.S. at 502, 103 S.Ct. at 1326 (quoting *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877).

In reaching its decision, the Court did not rely upon a particular list of factors to determine whether or not a seizure occurred. Rather, they viewed all the circumstances surrounding the incident to determine whether or not a reasonable person would have felt compelled to comply with the police request. The Court subsequently reaffirmed this "contextual approach," emphasizing that the test "is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation ... what constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs." *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988). *See also Bostick*, 111 S.Ct. at 2389.

Although in this case, as in *Royer*, the police identified themselves as narcotics

---

1. Although I do not believe that a seizure occurred when Terranova asked Glover to return to the NFTA Security Office, I agree with Judge

Altimari that there existed reasonable suspicion to justify a seizure, had one occurred.

agents, told Royer he was under suspicion, retained his identification and asked the suspect to accompany them to another room, these facts do not comprise the totality of the situation as they did in *Royer.* Throughout the encounter with Terranova, Glover did refuse some of the officer's requests. He did not allow Terranova to search his bags, replying that the officer lacked probable cause. He also declined to allow Terranova to telephone either his employer or his aunt to verify his story. In each instance, Terranova accepted Glover's response and did not pursue the matter. These actions on the part of both Glover and Terranova undermine any claim that Glover was intimidated by Terranova or felt compelled to comply with his requests. Consequently, I cannot find that under the circumstances of this case the police "convey[ed] a message that compliance with their requests [was] required." *Bostick,* 111 S.Ct. at 2386.[2]

Indeed, most of the factors indicative of whether a seizure has occurred are absent: the threatening presence of several police officers; the display of a weapon; physical touching of the person by the officer; and language or tone indicating that compliance was compulsory. *Springer,* 946 F.2d at 1016. The only factor suggesting coercion was the retention of Glover's identification papers by Terranova.

I believe that the detention of Glover's papers does not establish coercion, particularly when the identification in question consisted of a xeroxed social security card and a handwritten employment card. *See Montilla,* 928 F.2d at 583. There were no indications that Glover was not free to leave. Under these circumstances defendant's decision to accompany Terranova to the NFTA Office was made voluntarily, and no seizure occurred.

However, a seizure did occur when Terranova announced he would detain defendant's bags pending the arrival of a narcotics detection dog. By that time, Terranova's suspicions had been sufficiently confirmed to justify such a limited seizure. *See Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Terranova knew that Glover had lied about his criminal record, that he had a history of narcotics arrests, and had used aliases in the past. Such information, combined with Terranova's earlier observations, surely gave rise to the necessary "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.' " *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. at 1884).

Once the narcotics detection dog signaled the presence of drugs in Glover's bags, it was appropriate to search them. In any event, it is undisputed that Glover consented to the search. The search and seizure, like the preceding events, did not violate the defendant's fourth amendment rights.

OAKES, Chief Judge, dissenting:

"Do not take the express bus from New York City to Buffalo!" This little Attorney General's warning should be posted at the New York City Port Authority building for those who prefer not to be interrogated by DEA agents or local deputy sheriffs in Erie County as to their identification, place of employment, or reason for coming to Buffalo, or to be asked whether their luggage can be searched to see if they are carrying narcotics.

Reginald Glover made the mistake of taking that bus and doing four other very suspicious things:

First, he did not check his small Samsonite-type bag and shoulder-type bag in the

---

2. Indeed, in other cases involving different circumstances, each of the factors relied on in *Royer* have been found not to cause a seizure. *See, e.g., Torres,* 949 F.2d at 608 (finding no seizure when officers requested that Torres accompany them into police room); *Montilla,* 928 F.2d at 588–89 (finding no seizure, despite the fact that the officers identified themselves as narcotics agents, retained Montilla's identifica-

tion, and never told him he was free to leave); *Lee,* 916 F.2d at 819 (officer's statement that Lee was under suspicion for transporting drugs did not constitute a seizure, because "[v]iewing the statement in context, it is clear that the officer ... was merely verbalizing something that was already quite obvious from the circumstances.").

luggage compartment underneath the bus but, rather, presumably kept them in the overhead rack or on his seat and—surprisingly—carried them off the bus.

Second, he was sweating (on the 16th of May, 1990) and while we do not know how he was clothed, we do know that he had just finished an eight-hour bus trip.

Third, and this was a big mistake, while most if not all of the other passengers getting off the express bus walked through Gate 4 into the Buffalo Bus Terminal, Glover walked through Gate 5, all of twenty feet away; we do not know the dimensions of the doors at Gate 4 or the exact number of people on the bus (about 40), but it was, at least to the investigating agent, suspicious or "unusual" that Glover went through the different set of doors.

Finally, of course, he was, to the same investigator, continually looking around, walking in an almost exaggeratedly slow manner, and jerking his head around to look back over his shoulder as he came into the bus terminal.

It was these four things that caused the investigative agent, Paul Terranova, to stop Glover and to start asking him questions about his identification and the like, as well as the question whether he would agree to a search of his baggage. To that question Glover, I may say correctly, replied, "You don't have probable cause." I do not think that Investigator Terranova even had reasonable suspicion that Glover was engaged in criminal activity so as to justify the brief detention known as a "Terry-stop" after the progenitor case, *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a reasonable suspicion which I thought *Reid v. Georgia*, 448 U.S. 438, 440–41, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980) (per curiam), coupled with our own *U.S. v. Buenaventura–Ariza*, 615

F.2d 29, 37 (2d Cir.1980), had fairly clearly established was a prerequisite to such a stop.

I say this for the following reasons:

Sheriff's Investigator Terranova—I think that is technically his title, though as an investigator for the Erie County Sheriff's department he had been assigned to the DEA Task Force in Buffalo for about a year and a half to work the "transportation facilities" of Buffalo—was no Agent Whitmore of past Second Circuit fame.[1] Investigator Terranova had worked only for a year and a half on the transportation detail of the Buffalo Task Force, with no indication of outside training or other expertise. He had stopped over 250 people at the bus terminal and had participated in the arrests of several people—five or six, or maybe more—at least some of whom had successfully argued motions to suppress. I do not think that we can give, and I do not understand Judge Altimari to give, any special or extra weight to Investigator Terranova or his observations based upon his somewhat limited expertise and experience.

I also note preliminarily that the Buffalo Bus Terminal, known as the Niagara Frontier Transportation Authority (NFTA) Terminal, is not the same as an airport terminal where one's expectations of privacy would be diminished, as Justice Blackmun suggested, by the presence of "extensive antihighjacking surveillance and equipment." *Florida v. Royer*, 460 U.S. 491, 515, 103 S.Ct. 1319, 1333, 75 L.Ed.2d 229 (1983) (Blackmun, *J.*, dissenting), *quoted in Florida v. Rodriguez*, 469 U.S. 1, 6, 105 S.Ct. 308, 311, 83 L.Ed.2d 165 (1984) (per curiam). It is just a bus terminal and, unless there is to be some special rule for lowering Fourth Amendment expectations in transportation facilities in general (a special rule I have never heard of), is to be treated, I suppose, like a hotel lobby, an art

---

**1.** Drug Enforcement Administration Agent Gerard Whitmore figured in a number of Second Circuit cases involving airport stops over the years. *See, e.g., United States v. Vasquez–Santiago*, 602 F.2d 1069, 1072 n. 3 (2d Cir.1979), *cert. denied*, 447 U.S. 911, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980), and *United States v. Price*, 599 F.2d 494, 501 n. 8 (2d Cir.1979), detailing some of his cases. His legendary training and experience

probably well justified the extra weight we give to the powers of observation of an officer with superior training and experience. *See United States v. Oates*, 560 F.2d 45, 61 (2d Cir.1977). *But see Buenaventura–Ariza*, 615 F.2d at 36 (appellants' arrival from a source city and nervous demeanor were "wholly insufficient" to enable Agent Whitmore to reasonably suspect that they were involved in drug trafficking).

museum, an indoor shopping mall, or any other place where crowds of people congregate. Nor does the fact that these events took place in Buffalo, New York, have any special significance even though I note the comments in Judge Pratt's dissent in *United States v. Hooper*, 935 F.2d 484, 499 (2d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991), describing an encounter at the Buffalo airport as "yet another example of the aggressive tactics recently employed by federal law enforcement officials in the Buffalo area, which are well chronicled in our cases." *Id.* at 500 (citing cases).

So what of the "express bus" coming from a "source city"? As cases too numerous to cite have pointed out, "source cities," as testified to by law enforcement officers, include virtually every city in the United States of any size. Any Lexis or Westlaw search would reveal that "source cities" include every city with a population of over one million, most cities with over 500,000, and numerous cities with only over 100,000 inhabitants. Thus, millions of people arrive at various points of destination from source cities, so-called, yet they can hardly be subjected to virtually random seizures from the fact of their departure therefrom. *See Reid*, 448 U.S. at 441, 100 S.Ct. at 2754. "Source city" is essentially a meaningless term. The overnight express bus from New York City, arriving in Buffalo in the early morning, apparently is suspect purely and simply because a Drug Task Force operates regularly in transportation facilities, including the NFTA bus terminal at Buffalo.

Investigator Terranova testified that his suspicions were aroused in part because Glover had not checked his luggage, as according to him most people do on the express bus, but had apparently kept it in the overhead rack or on his seat, thus enabling him to walk off the bus with it.

Indeed, this luggage testimony was relied upon by the district court as one of the eleven critical facts bolstering its decision that the officers had reasonable suspicion that the defendant was carrying contraband inside his bags when, inside the NFTA office, the officers told him that they were going to hold his bags until a narcotics detection dog arrived.[2]

What's more, the district court found that Glover's unchecked luggage was "large," a fact which Judge Altimari correctly points out was clearly erroneous since the suitcase was "small," and his shoulder bag was presumably just that as well. True, Judge Altimari says that finding by the district court was a harmless error. But it is absurd, at least to anyone who has ever traveled on a bus, or an airplane for that matter, to suggest that there is something suspicious about not checking one's luggage in the under-bus compartment where it can be damaged or otherwise batted about; this is true if the luggage is small but also true with larger luggage, especially if it is soft or its contents are fragile.

How about Glover's walking through Gate 5 rather than Gate 4? To Investigator Terranova this was significant, though how many people would simply prefer to walk an extra 20 feet to avoid crowding with 40 other people between a single set of doors, all with luggage, must remain an unknown. Parenthetically, frequent or occasional commuters taking one of the crowded Metro–North trains arriving at Grand Central Station in New York would note that many people leave the train platform by an alternate gate rather than the gate of arrival. Of course, the Buffalo Bus Terminal might be different if it has wider doors. However, Border Patrol Agent William Spencer, who on the date in question was working the Buffalo bus ter-

---

**2.** As I read Judge Altimari's opinion, it holds that the seizure of Glover occurred at an earlier time—when the officers asked Glover to go to the NFTA office—than held by the district court. Judge Altimari is plainly correct on this. Two more of the district court's eleven critical "facts" disappear with that ruling—(1) the "false information" (by one day!) given to the officers by

Glover about his birthdate and about his criminal record, and (2) the criminal record and use of "aliases" (in fact, one alias)—since these did not arise until *after* the officers took Glover to the NFTA office. Source city, express bus, "large, unchecked baggage," and different gate equals four more facts that to my mind are of no significance whatsoever.

minal with Investigator Terranova, testified that Glover's use of a different gate was not in itself of concern to him. Nor do I see how it could be or could be reasonably.

What then of Glover's sweating, nervousness, glances around the terminal, exaggeratedly slow walk, and jerky movements? Both Terranova and Spencer thought this was "unusual"; as Agent Spencer testified, Glover was "more than modestly curious about his surroundings," whatever that means. It was as Glover was walking in the terminal in this manner that Investigator Terranova came up to Glover, identified himself, and started asking Glover a few questions. I would take it that, however proper it may have been for the agent to have asked Glover if he would mind answering a few questions at that point, the walking or nervousness was still insufficient to permit a finding that the agents then reasonably suspected Glover of criminal activity, *Buenaventura–Ariza*, 615 F.2d at 36, even though the initial interrogation may have been the sort of consensual encounter that the Supreme Court now holds implicates no Fourth Amendment considerations. *See Florida v. Rodriguez*, 469 U.S. at 5–6, 105 S.Ct. at 310–11.

Next, consider Glover's conduct and the identification he produced during the initial interrogation by Investigator Terranova that occurred prior to the moment when Terranova, backed up by Spencer, told Glover to accompany them to the NFTA office. The officers, the district court, and Judge Altimari rely on various aspects of this encounter in finding reasonable suspicion to conclude that Glover's baggage contained narcotics. The evidence from this encounter, none of which I find particularly suspicious, was as follows.

First and foremost, once again, Glover was nervous, visibly sweating, and shaking during this interrogation. I, for one, do not find that surprising when upon arrival at a bus terminal one is approached by a law enforcement officer who identifies himself as such and shows his DEA credentials. In fact, I suppose most people who are stopped by police officers are apt to be nervous and visibly so.

The second thing that Glover did which at least further aroused Terranova's suspicions, even if it were not relied upon either by the district court or Judge Altimari, was that when asked whether he had any identification, Glover replied affirmatively, reached down into the sock of his left leg, and retrieved a wallet from which he produced a handwritten employment identification card and a Social Security form. Terranova had never before seen anyone carry his wallet in his sock. Probably the judges do not rely on this behavior because in this day and age of insecurity people often try to conceal where they keep their money or other papers of value. I am surprised that Terranova found it significant.

Third, the employment identification card was handwritten with no photo attached to it, though it had Glover's name and address written on it and though, when they asked his name, Glover truthfully told it. Is the fact that it had no photo attached to it odd? I doubt it. The Social Security form was a photocopy, and while it had Glover's name it showed a different address from the employment card, and the Social Security number itself was indistinct or, in Terranova's word, "obliterated."

For Investigator Terranova, these items of identification did not add up; he testified that Glover did not have "any what I considered proper credentials." Again, neither the district court nor Judge Altimari rely on this lack of "proper" credentials. How many people have a different address on their employment identification card (if they have such) than on their Social Security card?

Finally, Terranova, the district court, and Judge Altimari rely on another aspect of the initial questioning: Glover's refusals to allow Terranova to confirm Glover's responses. Terranova asked Glover the nature of his visit to the Buffalo area and Glover said he was there to visit his aunt. Terranova, in light of the "improper" credentials, then asked Glover if he could call the aunt to confirm his identification, and Glover replied that he could not because his

visit was a surprise. Next, Terranova asked if he could call the place of employment to verify that Glover worked there, his name, and that he was on vacation to visit his aunt. Glover refused, however, explaining that his employer would show him as listed in the sick-book instead of on vacation. I find neither of these replies to what might seem to anyone as snooping interrogation particularly surprising or suspicious, even when coupled with the nervousness and all the other conduct referred to above.

This initial interrogation ended when Terranova asked Glover to come back to the NFTA office and, according to Terranova, Glover said "O.K." At this point, both Judge Altimari and I agree that Glover was seized,[3] particularly because Terranova was holding onto Glover's credentials and because Border Patrol Agent Spencer was by Terranova's side, though standing back and remaining silent during the conversation. It is precisely at this moment that we must make the ultimate determination under the Supreme Court case law whether the officers had "articulable suspicion that a person has committed or is about to commit a crime." *Florida v. Rodriguez,* 469 U.S. at 5, 105 S.Ct. at 310 (quoting *Florida v. Royer,* 460 U.S. at 498, 103 S.Ct. at 1324 (opinion of White, *J.*)). I assume that it still holds true that "articulable suspicion" includes the requirement that the authorities must "possess specific and articulable facts warranting a reasonable belief that a traveler's luggage contains narcotics," *United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983), where the luggage as well as the person is seized. For the reasons previously stated, I do not think the officers here possessed such facts, nor had such a reasonable belief.

Nothing in *Florida v. Bostick,* — U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) or any of the other recent Supreme Court cases is to the contrary. *Bostick* held simply that there was not a "seizure" within the meaning of the Fourth Amendment when officers boarded a bus and, without articulable suspicion, questioned a passenger and requested his consent to search his baggage for drugs, advising him of his right to refuse, without threatening him with a gun. Indeed, *Bostick* restates the proposition from the plurality opinion in *Royer,* 460 U.S. at 498, 103 S.Ct. at 1324, and *INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 1762–63, 80 L.Ed.2d 247 (1984), that "a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure."[4] 111 S.Ct. at 2387. Therefore, Glover's refusal to permit Terranova to search his luggage cannot weigh against him. Nor does *Michigan v. Chesternut,* 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988), do anything more than support the proposition that here Glover was seized when the officers asked him to go to the NFTA office, since its test that a seizure occurs when a reasonable person would believe that he or she is not "free to leave," applies in the case of a person who, like Glover, is walking down the street or through an airport lobby or bus terminal when he is stopped and interrogated by officers, even as qualified in the on-the-bus situation set forth in *Bostick,* 111 S.Ct. at 2387–88.

I therefore dissent. I do so on the basis of the facts of the case, the law as we have it from the Supreme Court and our own court, but also for a deeper reason. I would hate to see the day when people can randomly be stopped in bus terminals, department stores, office buildings or shop-

---

3. We are of course bound by *Florida v. Royer,* 460 U.S. 491, 501–06, 103 S.Ct. 1319, 1326–29, 75 L.Ed.2d 229 (1983), in which the Court stated at 501, 103 S.Ct. at 1326:

   Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

4. We will need help if it ever does, the Star Chamber and the Inquisition to the contrary notwithstanding.

ping malls by individuals holding temporary power in the government and asked, in the name of voluntary cooperation with law enforcement, for identification, travel papers, "credentials," to use Terranova's words, and on the basis of inability properly to satisfy the officer's standards—whatever they are—to be seized and held until a warrant can be obtained, a sniffing dog can be brought up, or "consent" is finally given. In short, I share the views of both the Florida court as quoted in the dissent of Justices Marshall, Blackmun and Stevens in *Bostick*, 111 S.Ct. at 2391, and Judge Pratt as stated in his dissent in *Hooper*, 935 F.2d at 499–500. One would hope that the war on drugs does not make for a police state.