UNITED STATES of America, Plaintiff,

v.

LaShandra PARKER, Defendant.

No. 93–CR–333A.

United States District Court,
W.D. New York.

July 18, 1994.

Patrick H. Nemoyer, U.S. Atty., Buffalo, NY, for Government; Leibert F. Coppola, Asst. U.S. Atty., of counsel.

John Humann, Buffalo, NY, for defendant.

**ORDER**

ARCARA, District Judge.

This case was referred to Magistrate Judge Carol E. Heckman pursuant to 28 U.S.C. § 636(b)(1), on December 23, 1993. On January 19, 1994, defendant filed a motion to suppress evidence seized from her at the time of her arrest, as well as statements made following her arrest.

On March 29, 1994, following a suppression hearing, Magistrate Judge Heckman filed a Report and Recommendation denying defendant's motion to suppress. On June 1, 1994, defendant filed objections to the Magistrate Judge's Report and Recommendation. This Court heard oral argument on defendant's objections to the Report and Recommendation on July 11, 1994.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Magistrate Judge Heckman made alternate findings regarding the defendant's motion to suppress. The Magistrate Judge found that defendant's initial encounter with the government agents and the initial search of defendant's baggage were consensual. Alternatively, the Magistrate Judge found that

the agents' initial stop and questioning of the defendant were supported by reasonable suspicion that the defendant was the travelling companion of a drug courier and that she was perhaps acting as the "mule."

Because the Court adopts the Magistrate Judge's finding that the agents' initial encounter with the defendant and the search of her baggage were consensual, the Court does not consider whether the initial stop and search were supported by reasonable suspicion. Further, the Court adopts the Magistrate Judge's finding that, once the agents asked defendant whether she was being used as a "mule" and she became evasive and her eyes began watering, there was, at that point, reasonable suspicion and the agents were justified in detaining defendant and her luggage for further investigation. Finally, the Court adopts the Magistrate Judge's finding that, once the agents asked defendant where she was carrying the drugs and she pointed to her stomach area in response, the agents, at that point, had probable cause to believe the defendant was engaged in the criminal activity of carrying narcotics.

Accordingly, for the reasons set forth in Magistrate Judge Heckman's Report and Recommendation, the Court denies defendant's motion for suppression of the evidence seized from her at the time of her arrest, as well as statements made following her arrest.

IT IS ORDERED that this matter be referred back to Magistrate Judge Heckman for further proceedings.

IT IS SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

Defendant has moved to suppress evidence seized from her at the time of her arrest, as well as statements made following her arrest. A suppression hearing was held on February 14 and 15, 1994. For the reasons set forth below, defendant's motion should be denied.

## BACKGROUND

The first witness to testify was Paul Terranova, an investigator with the Erie County Sheriff's Department. Deputy Terranova testified that on November 4, 1993, he was on duty at the airport in the upper concourse of the terminal servicing USAir. The DEA Task Force, of which he was a member, had previously received a tip about a subject who had taken an 8:30 a.m. flight to New York City that day and was carrying a large amount of cash. According to the tip, that subject was due to fly back into Buffalo at approximately 12:00 p.m. on a USAir Flight.

Deputy Terranova testified that the flight was delayed and arrived at approximately 1:10 p.m. He and three other officers (Fry, Gerace and Capezola) observed the passengers getting off the plane. He observed a person meeting the physical description of the subject leaving the plane. A young black woman who was later identified as the defendant was walking alongside and a little bit to the rear of the subject. She was carrying a small baby. The two walked together for 15 to 20 feet, at which time the defendant sat down in a chair facing the wall. She was holding the baby, a diaper bag and a purse. The subject continued through the terminal. The defendant kept looking at the subject as he went through the concourse by turning around and looking over her shoulder.

After observing the defendant for several minutes, Deputy Terranova then went down to the lower concourse and talked to Agent Johnson. He learned that Gerace and Fry were talking to the male subject in the lower concourse, and that the subject was using an alias but had no cash and no drugs. Deputy Terranova felt that the defendant was acting suspiciously. She appeared nervous, she was sitting with her face toward a wall away from other people and she continued looking over her shoulder at the male suspect. He therefore returned to the upper concourse with Agent Torre. The defendant made eye contact with Terranova and Torre, who were approximately 20 to 30 feet away. She then got up to make a telephone call, which was very brief, and then went toward the exit of the upper concourse. Torre and Terranova followed the defendant. Terranova testified that she appeared nervous, looked over her shoulder, quickened and then slowed her

pace several times and averted her eyes from their watch.

At the escalator, Terranova approached the defendant. He showed the defendant his credentials. Torre was behind him. Terranova asked to speak to the defendant and she replied, "sure." The group then came to a halt and a conversation ensued.

Deputy Terranova asked the defendant if she had just gotten off a flight from New York City and she indicated that she had. He advised her that he was a narcotics officer looking for drugs entering the area from New York City. He asked if she would mind if he checked her bag and her purse. She indicated she would not mind and handed both to Deputy Terranova. He placed them on a chair and looked through them and found no drugs. Agent Torre then asked the defendant for identification. She produced a Florida driver's license as identification, and an airplane ticket. The agents asked her about her travel plans. Deputy Terranova did not recall a specific answer. They then asked if she minded if they checked her luggage. She indicated she did not mind. Deputy Terranova then gave the claim check to Agent Torre and asked if it was okay to go get the bag and check it. She again stated that she did not mind. Torre turned over the claim check to Gerace. Gerace went to get the bag. In a few minutes, he returned with a bag and asked for permission to look through it. She said, "Go ahead." Agent Gerace then looked through the bag. During this time, the defendant sat down holding her baby.

After the suitcase was examined, Torre conversed with the defendant. Deputy Terranova did not hear this conversation. The defendant was then advised by Agent Torre that they were going back to the NFTA police office at the other terminal because Torre believed she was carrying drugs. The defendant began crying. The agents called for a female police officer, who transported the defendant to the NFTA police office. She was then taken into a bathroom by the female officer. Shortly thereafter, the female officer came out of the bathroom and handed a package to Torre, stating "here it is." The package was field tested and determined to contain crack cocaine.

On cross-examination, Deputy Terranova indicated that the agents had a physical description and a clothing description of a black male they were looking for as a result of the tip. The last name was "Gary." The tip did not include any information on a second person.

Deputy Terranova testified that aside from the subject of the tip and the defendant, there were only two other black passengers on the plane. This was an elderly couple in their mid-70's travelling together. He admitted that the DEA-6 (Exhibit 1) prepared after the arrest said nothing about the association between the defendant and Gary. He also testified that he did not see Gary and the defendant conversing as they got off the plane. He testified that his attention was alerted to the defendant because she was seated facing a wall, rather than facing the concourse area where someone who was picking them up would see them. He also testified that she repeatedly turned and looked in the direction of where Gary had gone. She looked in the direction of the officers, and appeared to avoid eye contact by glancing down. He also described the phone call as being secretive. He could hear her talking but not the words used. She was turned away and hunched down and appeared to be talking in low tones. He testified that she was free to leave during the time that she was being asked to consent to a search of her belongings. He also testified that she consented voluntarily to go to the NFTA police office.

The next witness to testify was Special Agent Philip Torre. Agent Torre testified that he also knew about the tip and arrived at the airport after the subject of the tip was being questioned by other agents. He learned from one of the agents that the subject had gotten off the plane with a black female who was carrying a small child. He met Deputy Terranova on the second floor, who confirmed this information. He went with Terranova to gate 7 and observed the defendant with her baby.

As far as the initial conversation with the defendant, Torre's testimony was consistent

with Terranova's. In essence, Torre testified that the defendant consented to a search of her purse, her diaper bag and her checked luggage. All three searches were negative. Torre then asked her if there was a possibility that she was being used as a mule or a courier. She put her head down, her eyes started watering and she avoided eye contact. Torre asked her if she minded if a female police officer searched her. The defendant hesitated and said she would not mind. She was asked if she was carrying any narcotics. She began crying and asked, "What's going to happen to my baby?" She was asked if she would mind going to the NFTA police office and she indicated she would not mind.

Officer Pettys, a female police officer with NFTA, arrived as the agents were leaving the terminal and going to the parking lot with the defendant. On the way out, Agent Torre asked the defendant where she was carrying the package and she pointed to an area near her stomach or her groin. Defendant was then placed in Officer Pettys' car and transported to the NFTA police office. She was taken inside, read her rights and searched by Officer Pettys. After the package of crack cocaine was discovered, defendant was questioned. She admitted making one previous delivery of narcotics to an individual named "Slim" in Buffalo.

The next witness to testify was NFTA Police Officer Michelle Pettys. She testified that on November 4, 1993, she was at the airport and was asked to go to the west terminal at approximately 1:30 p.m. She took her patrol car to the west terminal, at which time she met the defendant who was in the company of various other law enforcement agents. She sat the defendant in the back seat of her car with her baby, bag, purse and luggage. She then drove the defendant to the east terminal. When they reached the east terminal, they went into the NFTA police office and she was told to search the defendant. Prior to the search, the defendant was seated on a bench and Special Agent Torre advised her of her rights. Pettys then asked the defendant to come in the bathroom, which she did, bringing the baby. Officer Pettys put the baby in

a chair and then proceeded with a search of the defendant. She found a girdle under her skirt containing a large bulge. The defendant removed the package from the girdle and handed it to Officer Pettys.

The next witness to testify was the defendant, Lashandra Parker. She testified that she is single and that her baby is currently four months old, having been born October 2, 1993. As of November 4, 1993, her baby was four weeks old. She came to Buffalo from Fort Lauderdale. She got on the plane at approximately 7:20 a.m., switched planes at LaGuardia airport and continued on to Buffalo. She testified that she talked to no one on either of the two flights and that she travelled alone with the baby. She noticed a few black people on the plane, but did not sit near them and was not close to any black persons when she deplaned. She specifically denied leaving the plane with a black male. When she arrived in Buffalo, she stopped at the chairs in the terminal in order to put a snowsuit on her baby. She testified that she was facing where the people come and go in the terminal, not toward the wall as the agents had testified.

The defendant testified that she sat for three to four minutes and then made a phone call. After dialing, she got an answering machine and left a message. She stated that she did not whisper or attempt to conceal her conversation. She did not notice anyone watching her and walked to get her luggage. She was stopped when she went past the metal detector and touched on the shoulder by a DEA agent, who she recognized in court as Agent Terranova. He advised her that he was looking for drugs and asked to talk to her. He asked her if she knew anyone known as Barry. She stated that she did not. He stated, "Well, Barry knows you," and then asked her if she was travelling with anyone. She stated that she was, meaning that she was flying with her baby.

The defendant denied that she consented to the search of her personal belongings. The agents told her that they were going to look in her purse and did not ask her permission. They also told her, "You're not going anywhere." As they were looking through her purse, she was asked about identification.

Torre then asked to look at her checked bag. The question presented was, "Do you mind if we get your luggage?" She said "No." They retrieved her luggage and asked her if it was hers. She said "Yes," and the agents searched the suitcase, again without asking permission. The defendant testified that there were four agents surrounding her, and she did not feel free to go. They then asked her if she minded if they called a female officer to do a search. She stated she did not mind, but she felt she had no choice.

According to the defendant, she was transported to the other terminal in an NFTA police car driven by a male agent wearing a short-sleeved shirt and carrying a gun in a shoulder holster. When she arrived, the agents asked her if she knew she was under arrest and she testified that she did not because no one had read her her rights. The agents laughed, read her her rights and then conducted the search.

On cross-examination, the defendant testified that she came to Buffalo previously to visit Slim but not for the purpose of delivering drugs. The defendant denied knowing "Gary," the target of the investigation.

She testified that when she got to the airport on November 4, she made a phone call to Slim and left a message on the machine. When she got off the plane, she was not paying attention to any other passengers. After deplaning, she purposely isolated herself in the seats on the left in order to put on the baby's snowsuit.

In rebuttal, the government recalled Agent Torre. He testified that when the defendant began to cry in response to their questioning about drugs, he felt he had reasonable suspicion to believe she was transporting narcotics, and he would not have allowed her to leave if she had asked. If she had not consented to a personal search, he would have detained her and asked for a dog to sniff the defendant's person for drugs.

Agent Torre reviewed the admission defendant had made when he asked her where she was carrying the drugs and she pointed to her stomach. He said at that point he felt he had probable cause to arrest and that he would have arrested and searched the defendant even if she had not consented to a search of her person.

The next rebuttal witness to testify was Special Agent Gerace. He was on duty on November 4, 1993. He had received information from the NFTA police regarding a passenger flying out in the morning with a large sum of cash and returning two and one-half hours later. He had a description of the individual's physical appearance and clothing, as well as a name under which the person was traveling. He does not recall the exact physical description or the clothing description. He does recall that it was a black male in his mid-20's with a duffle bag.

Agent Gerace testified that he was present at the terminal when the USAir flight from New York City arrived. He observed an individual who met the description contained in the tip and questioned that individual on the lower concourse. Gerace did not recall the name on the target's ticket, but did recall that it was the same name that was contained in the tip. He was confident that the man questioned met the description contained in the tip but could recall no details about the description. He talked to other officers and told them that the target had no drugs and consented to a search of his bag and his person and nothing was found.

Gerace then learned from other officers that there may be a female travelling with the target. He went back to the target and asked him if he was flying with another person. The target stated that he was not. Gerace then went upstairs and saw Torre and Terranova talking to a black female. He stayed in the background to avoid intimidating the defendant. Agent Torre then came over and gave him the luggage slip and asked him to go down and get the suitcase, which he did. He brought it back within a few minutes. He then went back downstairs.

Gerace was dressed in plain clothes. He had a weapon in a shoulder holster but it was concealed under a coat. He went back and asked the target if he was sure he was not travelling with someone else. The target said, "No." He then returned to Torre and Terranova and went with them to the NFTA police office with the defendant.

There was extensive cross-examination on the nature of the weapon Gerace was carrying and whether it was concealed. Gerace testified that he was armed, but his weapon was never displayed to the defendant.

Finally, the defendant testified in sur-rebuttal. She testified that Gerace was carrying a black-handled gun in a holster under his arm and that it was clearly visible to her. She also recalls that Gerace was the person who drove her to the NFTA police office.

## DISCUSSION

Defendant moves to suppress evidence seized from the defendant at the time of her arrest, as well as statements made following her arrest. The defendant concedes that the initial questioning was justified and need not be supported by either probable cause to arrest or reasonable suspicion of criminal activity. *Florida v. Bostick,* 501 U.S. 429, 433–36, 111 S.Ct. 2382, 2386–87, 115 L.Ed.2d 389, 398–99 (1991). The agents approached the defendant in a public place, identified themselves, and, in a non-threatening way, asked her certain questions, requested identification and asked whether she would consent to a search of her belongings. No weapons were displayed and there was no physical contact. Even though the defendant may have believed that she had no option but to talk to the police and agree to their requests, measured by an objective standard, it is clear that no seizure had taken place. *See, e.g., U.S. v. Glover,* 957 F.2d 1004, 1009 (2d Cir.1992).

However, defendant argues that the initial legal stop became an unlawful detention as the police continued to question and search her. Specifically, the defendant argues that at the point in time when the agents searched her checked luggage, if not earlier, she had been illegally "seized" within the meaning of the Fourth Amendment. According to the defendant, subsequent incriminating actions and statements (such as crying in response to the question of whether she was a mule and pointing to her stomach area in response to the question of where she was carrying the drugs) were the product of an illegal detention. Furthermore, defendant maintains that she never gave a valid consent to the search of her belongings, her luggage or her person.

It is not disputed that a warrantless search conducted pursuant to a valid consent is constitutionally permissible. *Schneckloth v. Bustamonte,* 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973). The government has the burden of establishing consent by a preponderance of the evidence. *Bumper v. North Carolina,* 391 U.S. 543, 549, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968).

There is a direct conflict in the testimony on the question of whether the defendant consented to a search of her belongings. Defendant testified that she did not consent to a search of her handbag, her diaper bag or her checked baggage. The agents, in contrast, testified that she did. After hearing the testimony of the witnesses at the hearing, I conclude that the more credible version of events is that provided by the agents. I therefore reject the defendant's testimony on this issue and find that she did in fact consent to the search of her handbag, her diaper bag and her checked baggage.

But even if the defendant had not consented to these searches, I find that the agents had "reasonable suspicion supported by articulable facts that criminal activity 'may be afoot ...'" when they initially stopped and questioned the defendant. *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1 (1989) (quoting *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 1884, 20 L.Ed.2d 889 (1968)). The defendant got off the plane in the vicinity of an individual who met the description of a person who had left for New York that morning with a large amount of cash and had returned to Buffalo only several hours later. The agents reasonably believed that the defendant was the traveling companion of a drug courier and that she was perhaps acting as the mule. The male who was the subject of the tip met the description they were looking for, and was using an alias which was the same alias provided in the tip. They therefore were justified in questioning the defendant, who exited the plane in his vicinity.

In summary, whether the initial questioning is viewed is a lawful *Terry* stop or as a consensual encounter, I find that there was no violation of the defendant's constitutional rights at the time the agents searched her purse, her diaper bag and her checked luggage.

■ After these searches were completed, Agent Torre questioned the defendant as to whether she was being used as a mule, and she became evasive and her eyes began watering. This added to the agents' reasonable suspicion. The agents were clearly justified in detaining her and her luggage for further investigation. At that point in time the defendant was not free to leave and had in fact been seized. *Florida v. Royer*, 460 U.S. 491, 501–02, 103 S.Ct. 1319, 1326–27, 75 L.Ed.2d 229 (1983) (plurality opinion).

The defendant was then asked to accompany the agents to the other terminal to undergo a search of her person by a female agent. As they were leaving the building, Agent Torre asked the defendant where she was carrying the drugs and she pointed to her stomach area in response.

At that point in time, the agents had probable cause to believe that the defendant was engaged in the criminal activity of carrying narcotics. Even if she had not consented to a search of her person, I find that the agents would have been justified in searching her person based on the probable cause which existed. Agent Torre testified that female defendants arrested by the DEA for drug trafficking crimes routinely undergo thorough searches by female agents. This search would have included disrobing of the defendant and an examination of body cavities. Accordingly, even if the defendant had not agreed to be searched by the female officer, I find that she would have been searched in any event as part of an arrest procedure.

Furthermore, Agent Torre testified that had the defendant not granted permission to search her person, he would have sought other means to conduct the search, possibly by requesting the aid of a drug-sniffing dog. Even if the agents at that point in time did not have probable cause, they certainly had reasonable suspicion, and would have been justified in detaining the defendant, calling a narcotics dog and having her person sniffed for the presence of narcotics. *U.S. v. Glover, supra,* 957 F.2d at 1010–11.

Finally, I find that the defendant lawfully consented to the search of her person when the government requested her to undergo such a search. I specifically reject the defendant's testimony that she was coerced into giving this consent.

Regarding the defendant's credibility, I find that there are several inconsistencies in the testimony which justify a finding that she was not a credible witness. First of all, Officer Pettys, a female officer, testified that she drove the defendant to the NFTA police station in the other terminal. The defendant stated that she was driven to this terminal by a male agent carrying a gun in open view. I find no reason to discredit Officer Pettys' testimony and find that the defendant was not credible on this point. In addition, the defendant denied admitting to the agents that she had previously brought drugs to the Buffalo area for "Slim." She testified that she previously came to meet with Slim but denies bringing drugs with her on that occasion. This is directly contrary to the agents' testimony of the defendant's admissions after her arrest. Finally, I find that the defendant's demeanor on the witness stand as well as her responses to questions was not as credible as the testimony of the government witnesses.

For these reasons, I resolve the conflicts in the testimony in favor of the government and against the defendant.

## CONCLUSION

For the foregoing reasons, it is recommended that the defendant's motion be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after

receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

The district court will ordinarily refuse to consider on *de novo* review arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Government and the Defendant.

**SO ORDERED.**

DATED: Buffalo, New York

March 29, 1994