UNITED STATES of America, Plaintiff,

v.

**CERTAIN REAL PROPERTY AND PREMISES KNOWN AS 63–29 TRIMBLE ROAD, WOODSIDE, NEW YORK, Defendant.**

No. CV–88–1453.

United States District Court,
E.D. New York.

Sept. 9, 1992.

Warren Ausubel, Asst. U.S. Atty., for the U.S.

MEMORANDUM AND ORDER

GLASSER, District Judge:

This forfeiture action was brought pursuant to section 881(a)(7) of Title 21, United States Code, against the defendant premises. The complaint alleges that the premises, owned by claimants Juan Carlos Aldeco and Betty Aldeco, were used to facilitate trafficking in cocaine in violation of 21 U.S.C. § 841 *et seq.* For the reasons indicated below in the findings of fact and conclusions of law, this court holds that plaintiff carried its burden of proof at the bench trial, and orders that the defendant property be forfeited.

## I. Findings of Fact

### A. The investigation and trial of Betty Aldeco and Hugo Castro

The first testimony offered by the government was that of Ann Hayes, a Special Agent with the Drug Enforcement Administration in New York from 1984 to 1989. Hayes, who was employed in the DEA's narcotics conspiracy group for this judicial district, attested to her personal involvement in an investigation into narcotics trafficking at the defendant premises.

Specifically, Hayes testified that in the summer of 1987, an informant named Archibald told the DEA that two residents of 63–29 Trimble Road—Betty Aldeco and her son Hugo Castro—were dealing in cocaine. On July 16, 1987 while working undercover, Hayes personally observed Castro selling one-eighth of a kilogram of cocaine to Archibald in an automobile. Tr. 16. On July 20, Hayes and Archibald went to the defendant premises to obtain a promised sample of heroin from Castro; on their arrival, Castro explained that he was unable to procure the sample, and the transaction was never consummated.

On November 12 of that same year, Hayes again accompanied Archibald to the residence, where she met Betty Aldeco. Hayes paid Aldeco $300 in satisfaction of a prior narcotics debt owed by Archibald. Tr. 17. On November 18, Hayes met Castro and his girlfriend Mila Bonilla at a Manhattan restaurant to discuss future cocaine transactions centering on Hayes' supposed ability to arrange for delivery of the drugs through Miami via a relative employed by an airline. According to Hayes, at the end of a lengthy conversation Castro expressed strong interest in working out a mutually beneficial arrangement for distributing cocaine.

In April 1988, Hayes and other DEA agents formulated a plan to purchase two kilograms of cocaine from Castro. On April 13, Hayes and a second DEA agent met Castro at the house and went inside. While the agents waited in the living room, Castro went upstairs—where Juan Carlos and Betty Aldeco had their bedroom—and returned with a black camera bag containing two packages wrapped in duct tape. The agents then drove Castro to a hotel near LaGuardia Airport for the ostensible purpose of collecting the cash to be given as payment, at which point Castro was placed under arrest by other DEA agents. Tr. 19.

The government also offered the testimony of a second DEA agent, Stephen Marchini. Marchini testified that he conducted surveillance on the Trimble Road residence during the afternoon of April 13, 1988, where he observed Betty Aldeco, Juan Carlos Aldeco (her husband), and Castro and his girlfriend coming and going from the house in the period from 4:30 p.m. to 5:45 p.m. Tr. 23–24. Marchini and other agents followed Special Agent Hayes to LaGuardia that evening, where they arrested Castro and seized the two packages, which later proved to contain cocaine. Tr. 24–25.

The agents then returned to Trimble Road to execute an arrest warrant for Betty Aldeco, who was not there. Marchini arrested Mila Bonilla as she attempted to exit the basement apartment. A subsequent consensual search of the basement turned up a metal box containing $5,000 in bundled currency. Tr. 26. Further investigation of the premises revealed a bundle of currency (approximately $5,490) lying on a table in the upstairs study.

As the agents prepared to leave the scene, a car driven by Juan Carlos Aldeco pulled up in front of the house. Marchini walked over to the passenger side, where he observed Betty Aldeco attempting to conceal a plastic bag underneath the car seat. Upon arresting Betty Aldeco, Marchini determined that the bag contained approximately $9,000 in currency. Tr. 27–28.

As Plaintiff's Exhibit 1, the government offered a certified copy of the subsequent indictment charging Hugo Castro and Betty Aldeco with multiple counts of conspiracy to possess, and possession with intent to distribute, cocaine and heroin. Exhibit 2 is a copy of Castro's March 17, 1989 judgment and conviction on all five counts charged in the indictment, pursuant to his

guilty plea. Exhibit 5 is the lengthy transcript of the trial resulting in Betty Aldeco's conviction, as further attested by a copy of her March 17, 1989 judgment and conviction, received into evidence as Plaintiff's Exhibit 3.

### B. The Aldecos' Financial Involvement with Cimtech Corporation

The government elicited testimony from Andrew Jaskewicz, a certified public accountant, concerning the affairs of a certain Cimtech Corporation based in New Jersey. Jaskewicz testified that Hugo Castro hired him to serve as the corporation's accountant in late 1987, shortly after the company was incorporated. He also testified that the person in charge of operations was Miguel Forero, husband of Betty Aldeco's daughter Vivian Castro.

According to the corporate tax return Jaskewicz prepared for Cimtech for the period 9/9/87 to 8/31/88, Cimtech lost $47,801 in its first year of business. Tr. 41 & Plaintiff's Exh. 7. Jaskewicz indicated that for a corporation of Cimtech's size, this represented a substantial loss. He also indicated that Juan Carlos Aldeco attended a May 1988 meeting along with Jaskewicz and other persons involved with Cimtech's operation, and that Aldeco expressed a strong interest in seeing the corporation survive its financial difficulties.

Jaskewicz also testified, in reliance on Cimtech's general ledger for the 1987–1988 year, that the Aldecos made loans to Cimtech that year in excess of $159,000. Exhibit 8 (the ledger) shows that amount as the sum of various loans made by "B. Aldeco" and "Carlos", whom Jaskewicz identified as the Aldecos. Tr. 42–43. That amount is confirmed by page 4, Schedule L, line 18 of Cimtech's 1987–1988 tax return. Moreover, Cimtech's general ledger for 1988–1989 shows additional loans from "Carlos" in excess of $2,000, making a total of over $161,000 in loans.

The government also called Kenneth Altman, a certified public accountant, as an expert on the subject of corporate financial records. Based upon an examination of Cimtech's bank records and general ledger,

Altman testified that for the period from November 1987 to May 1990, the Aldecos made direct cash loans to Cimtech of at least $89,000. Tr. 56. That number represents a minimum amount, as it does not account for the loans paid directly to Cimtech's creditors and does not include certain bank deposits for which the check/cash breakdown was unspecified. Tr. 56. According to Altman, the bank records and general ledger were fully consistent in reflecting these amounts, notwithstanding the unavailability of bank records for three months in 1988. Tr. 57.

Altman also provided an analysis of the Aldeco's personal income tax returns for the years 1980–1989. Those returns, received as Plaintiff's Exhibits 12–21, reflect a total gross income of $127,599. After subtracting federal, state, and FICA taxes, as well as deductions itemized on the individual returns, Altman concluded that the Aldecos would have approximately $57,700 in disposable income for the ten-year period in question. Exhibit 23, schedule 4, page 3.

The government's final witness was Anna Muñoz, a secretary previously employed by Cimtech. Muñoz testified that she assisted in preparing receipts for bank deposit in collaboration with Jaskewicz, and that the only cash she handled was that representing loans to Cimtech from Juan Carlos Aldeco. Tr. 65. According to Muñoz, the cash was generally in the form of small bills. Tr. 66–67.

Because claimants Betty and Juan Carlos Aldeco offered no evidence or testimony, none of the above was controverted.

### II. Conclusions of Law

■ In forfeiture actions under section 881(a)(7), the government must establish probable cause that the property was used to facilitate narcotics offenses. *See United States v. Certain Real Property and Premises Known As 418 57th St.*, 922 F.2d 129, 130 (2d Cir.1990). Once probable cause is established, an owner may mount an affirmative defense by showing that the property was not in fact used unlawfully, or that the illegal conduct occurred without the owner's knowledge or consent. *Id.*

The government has met its burden in this case. Under well-established law, proof of a property owner's conviction for narcotics offenses committed at the premises suffices to establish probable cause. *See United States v. All Right, Title & Interest in Real Property & Building Known As 303 W. 116th St.*, 901 F.2d 288, 292 (2d Cir.1990). Moreover, principles of collateral estoppel render such proof irrebuttable. *Id.* at 290. In this case, the government demonstrated that both claimant Betty Aldeco and her son Hugo Castro were convicted of engaging in narcotics transactions at the defendant premises, thereby establishing conclusively the necessary probable cause.

Because Betty Aldeco cannot avail herself of the "innocent owner" defense, and because Juan Carlos Aldeco offered no evidence in support of such a defense on his own behalf, neither claimant carried the burden of proving this affirmative defense. Even had they attempted to do so, it is difficult to imagine how it could have been established by a preponderance of the evidence that Juan Carlos Aldeco was unaware of the narcotics dealings conducted at his home. Special Agent Hayes testified that on April 13, 1988, Hugo Castro retrieved the two kilograms of cocaine from the upstairs floor of the house where the Aldecos had their bedroom. Later that same evening, Agent Marchini and others found over $5,000 in cash lying in plain view in the study on that same floor. When the Aldecos were detained that evening, Betty Aldeco was found in possession of a bag containing $9,000 in cash in the front seat of the car driven by Juan Carlos. These facts alone render it almost inconceivable that he could have been unaware of the illegal activities taking place on the premises.

Even more damning, however, are the Cimtech corporate records reflecting Juan Carlos's numerous and sizable loans. It is settled law that possession of large amounts of unexplained cash is evidence of narcotics trafficking activities. *United States v. Gonzalez*, 922 F.2d 1044, 1056 (2d Cir.), *cert. denied*, — U.S. —, 112 S.Ct.

660, 116 L.Ed.2d 751 (1991). The testimony of Andrew Jaskewicz and Kenneth Altman clearly establishes that the Aldecos made over $161,000 in loans to Cimtech, money which far exceeds the disposable income reflected on the Aldecos' tax returns from 1980 through 1989. Moreover, Altman's analysis of Cimtech's bank deposits, as well as Anna Muñoz's testimony, establishes that a substantial portion of that money was provided by the Aldecos in cash. Given these unrebutted facts, this court has no choice but to conclude that neither claimant has established a sufficient innocent owner defense.

Accordingly, this court declares judgment for the plaintiff, and orders that the defendant premises be forfeited.

SO ORDERED.