### UNITED STATES of America

v.

### Ronald Reagan WOODS, Defendant.

### No. 92–CR–177S.

United States District Court,
W.D. New York.

March 30, 1993.

---

**12.** Given the remand, the merits of plaintiff's constitutional claims need not be reached.

Dennis C. Vacco, U.S. Atty., Thomas S. Duszkiewicz, Asst. U.S. Atty., Buffalo, NY, for U.S.

John V. Elmore, Buffalo, NY, for defendant.

## ORDER

SKRETNY, District Judge.

Whereas pursuant to 28 U.S.C. § 636(b)(1)(B) and by Order dated November 2, 1992, this Court referred all dispositive motions to the Hon. Carol E. Heckman, United States Magistrate Judge for report and recommendation, and

Whereas on February 22, 1993 Magistrate Judge Heckman issued a report recommending that defendant's motion to suppress certain physical evidence seized pursuant to a valid search warrant be denied, and

Whereas defendant has not filed objections to the Magistrate Judge's Report and Recommendation,

IT HEREBY IS ORDERED, that, upon careful consideration, this Court accepts the Magistrate Judge's Report and Recommendation in its entirety including the reasons set forth and the authority cited therein.

FURTHER, counsel for the parties and the defendant shall appear before this Court Part IV, Mahoney State Office Building, 65 Court Street, Buffalo, New York, on Friday, April 2, 1993 at 9:00 a.m. for a status conference.

SO ORDERED.

## REPORT AND RECOMMENDATION

HECKMAN, United States Magistrate Judge.

Defendants have moved to suppress evidence obtained by the Government as a result of a stop of the Defendant at the Amtrak train station in Buffalo, New York on January 30, 1992. This motion was referred to the undersigned for report and recommendation.

A suppression hearing was held on November 30, December 3 and December 22, 1992. Testifying at the hearing were the five police officers involved in the arrest, as well as the Defendant and his great-grandmother. Thereafter, the parties requested and were given an opportunity to file additional briefs.

For the reasons set forth below, it is recommended that Defendant's motion be denied.

### BACKGROUND

Defendant was indicted on August 6, 1992 in a one-count indictment alleging a violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B). The indictment arose out of the stop of the Defendant at the Amtrak train station in Buffalo, New York on January 30, 1992.

The testimony at the suppression hearing established the following. On January 30, 1992, United States Border Patrol Agents Daniel F. Allman and Patrick Norton were present at the Amtrak station on Exchange Street in downtown Buffalo, New York, observing passengers getting off the afternoon train from New York City. They were working in conjunction with Drug Enforcement Agency Task Force Agents Daniel Fritton and Paul Terranova (T1 at 4–6).[1] The train arrived at approximately 4:20 p.m. (T1 at 37). Agent Allman, who was not in uniform, and Agent Norton, who was wearing his uniform, were standing near their marked Border Patrol car in the Amtrak station parking

---

1. References are to the transcript of the suppression hearing held by this court on November 30, 1992 (T1), December 3, 1992 (T2) and December 22, 1992 (T3).

lot when they observed Defendant get off the train and walk in their direction (T1 at 7–8, 39). Defendant took two or three steps toward the agents. He then looked in their direction, turned to his right, and walked toward the track-side entrance to the Amtrak station (T1 at 8, 40).

Agents Terranova and Fritton were standing near the track-side (rear) entrance to the Amtrak station. They were not in uniform. Agent Fritton observed Defendant get off the train, walk toward the parking lot, change direction and walk toward the station entrance. As he walked past the track-side entrance, Defendant looked in the direction of Agents Fritton and Terranova. He then turned around and entered the Amtrak station through the track-side door (T1 at 40–41). He walked directly through the station and exited through the front doors (T1 at 9).

As Defendant left the station, Agent Allman approached him, identified himself as a Border Patrol agent, and showed him identification. He asked Defendant if he could ask him a few questions, to which Defendant answered "yes, what do you want" (T–1, p. 9). Allman asked Defendant if he was a United States citizen, where he was born, where he lived and where he was coming from. Defendant responded that he was a citizen of the United States, was born in Buffalo, lived on Northland Street and was coming from New York City (T1 at 9; T2 at 78). Defendant was unable to produce any identification (T1 at 17, 45–46). He stated that he was in New York City for three days to attend his grandmother's funeral (T1 at 11, 44).

During this conversation, Agents Fritton and Terranova approached. Agent Allman introduced Agent Fritton to Defendant as a Drug Enforcement Agent concerned with narcotics being brought into the Buffalo area (T1 at 43–44). Allman asked Defendant if he was carrying any narcotics in his luggage, to which Defendant responded "no" (T1 at 44). Allman then asked Defendant if the agents could look in his luggage, to which Defendant responded "do I have to? I'm kind of tired" (T1 at 45). Agent Fritton explained to Defendant that he did not have to allow the agents to look in his luggage, upon which

Defendant said "I'd rather you didn't then" (*id.*).

Agent Fritton then asked Defendant if there were any outstanding warrants for his arrest, and whether Defendant had ever been arrested in the past (T1 at 46). Defendant responded that there were no outstanding warrants, but that he had previously been arrested for "drugs" (*id.*). Fritton then asked Defendant if there was anyone they could call to verify his identity, to which Defendant stated that his mother could (*id.*).

Fritton also asked Defendant if he would be willing to accompany the agents to the Niagara Frontier Transit Authority ("NFTA") bus terminal police office to verify his identity and explained that once they had verified his identity, the agents would be happy to bring him back to the Amtrak station or take him wherever he wanted to go. According to Fritton, Defendant responded "no, that's all right, I'll get to where I'm going on my own" (T1 at 46). According to Agent Allman, Defendant agreed to go to the NFTA office with Agent Fritton (T1 at 12). According to the Defendant, Agent Terranova told him he was not free to leave until they verified his identification, and that he "had" to go with the agents to the NFTA office to do so (T2 at 80–81). According to Terranova, Agent Fritton asked Defendant if he would mind accompanying the agents to the NFTA terminal, Fritton offered to bring Defendant back to the Amtrak station or take him wherever he was going, and Defendant responded "okay, but I could get to where I am going on my own" (T2 at 34).

Defendant then accompanied Agents Terranova and Fritton to their unmarked vehicle. Agent Terranova opened the back door of the vehicle and Defendant got in, carrying his own luggage (T2 at 35–36). Terranova drove the vehicle about three blocks to the NFTA terminal. During the ride, which took "[a] couple of minutes" (T2 at 37), Terranova and Fritton asked Defendant to provide further details about his grandmother's funeral in New York, but he was unable to do so (T2 at 36–37). Defendant also told the agents that his mother would not be able to confirm his New York trip since she knew nothing about it (T1 at 50; T2 at 37).

Upon arrival at the NFTA terminal, Defendant and Agent Fritton went into the police office where they met Special DEA Agent Bruce R. Johnson (T2 at 52). Fritton explained the situation to Johnson, and Johnson asked Defendant similar questions about the funeral and obtained similar answers (T2 at 53). Defendant then provided Johnson with a telephone number, which he first said was his mother's, then his grandmother's, then his great-grandmother's (T2 at 54). Johnson called the number, and spoke to a woman who identified herself as Mariah Jemison, Defendant's great-grandmother (T2 at 54–55, 129). Mrs. Jemison identified Defendant as her great-grandson, and told Johnson that Defendant's grandmother had lived in New York, but had died five years ago (T2 at 56, 130).

Based on this information, Agent Johnson advised Defendant that his luggage was going to be detained temporarily for a check by a narcotics-sniffing dog. Johnson offered Defendant the option of staying to observe the dog sniff, or leaving the office with a receipt for his luggage. Defendant signed the receipt, and left the NFTA office at approximately 4:55 p.m. (T2 at 57–59).

The agents then took Defendant's luggage, which consisted of three bags of various sizes, to the DEA office and attempted unsuccessfully to contact Border Patrol Agent Scott VanTyne and his dog Roscoe. Eventually, Buffalo Police Detective Ronald Jakubczyk and his dog Robby, as well as NFTA Police Officer Michael Full and his dog Sandor were contacted. Both dogs arrived at approximately 6:00 p.m. and positively alerted to the presence of drugs in Defendant's luggage (T2 at 59–61).

Based on this information, a search warrant was issued authorizing the agents to search the three bags for evidence of drug distribution. The search revealed three tape-wrapped packages containing approximately four kilograms of cocaine and $2,225.00 in U.S. currency.

## DISCUSSION

Defendant moves to suppress the evidence seized from his luggage on the ground that he was arrested without probable cause when the agents required him to get into the vehicle and accompany them to the NFTA office. The government responds that Defendant voluntarily consented to accompany the agents to the NFTA office to check his identity and that the agents' request was reasonable under the circumstances.

Defendant concedes that the initial encounter with Agent Allman at the front entrance of the Amtrak station was a permissible investigative "stop" under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Defendant argues that when the agents required him to get into the police vehicle and accompany them to the NFTA office, the encounter ceased to be a *Terry*-type detention that could be justified based on reasonable suspicion and instead became an arrest requiring a showing of probable cause. *See United States v. Hooper*, 935 F.2d 484, 494 (2d Cir.), *cert. denied*, — U.S. ——, 112 S.Ct. 663, 116 L.Ed.2d 754 (1991).

The several Second Circuit decisions dealing with drug seizures at Buffalo "transportation facilities" provide ample precedent for the legal issues presented by this case. *See, e.g., United States v. Glover*, 957 F.2d 1004 (2d Cir.1992); *United States v. Torres*, 949 F.2d 606 (2d Cir.1991); *United States v. Springer*, 946 F.2d 1012 (2d Cir.1991); *United States v. Hooper, supra; United States v. Lee*, 916 F.2d 814 (2d Cir.1990).

In *Glover*, the defendant was approached by two officers at the NFTA bus terminal, and was questioned by one officer about his identity and his purpose for traveling to Buffalo. The defendant produced identification, but refused the officer's request to search his bags. He did agree to accompany the officers to the nearby terminal office for a further check of his identification. While there, the officer informed the defendant that his bags would be detained for a dog sniff, which took place in the defendant's presence about thirty minutes later, and which indicated the presence of narcotics in defendant's bags.

In affirming the district court's denial of Defendant's suppression motion, the Court found that Defendant and his luggage had been detained at the point in the encounter when the officer requested the Defendant to

leave the public area of the terminal and return to the NFTA security office for further questioning. However, the court went on to find that this was a permissible *Terry* stop supported by reasonable suspicion, which did not ripen into a *de facto* arrest that must be based on probable cause.

This case falls squarely within the Second Circuit's analysis in *Glover*. When the police officers requested Woods to accompany them to the NFTA police station, they had reasonable suspicion to believe that the Defendant was transporting narcotics, thereby warranting the detention of the Defendant and his bags for further investigation. Defendant was travelling from a "source" city. *United States v. Glover, supra,* 957 F.2d at 1006; *United States v. Montilla,* 928 F.2d 583, 584 (2d Cir.1991). After getting off the train, he appeared to take action to avoid confrontation with both uniformed and plain clothes agents. He appeared nervous, failed to produce any identification, and had discarded his train ticket. He admitted to a prior narcotics arrest.

■ On the question of consent to accompany the agents, the testimony at the hearing was conflicting. The Defendant testified that he did not consent. The agents testified that he was asked to go with them, and agreed to go without any coercion on their part. After hearing the testimony on this point, I find that the Defendant had no reasonable option but to accompany the agents. His acquiescence should not be viewed as consent, but rather as a realistic assessment of the futility of resisting their request. *But see U.S. v. Torres,* 949 F.2d 606 (2d Cir. 1991); *U.S. v. Springer,* 946 F.2d 1012 (2d Cir.1991).

Nevertheless, it is unnecessary to resolve the conflict in the record because, as explained above, the detention was a permissible *Terry* stop under the *Glover* case.

■ Having determined that there was reasonable suspicion to justify transportation of Defendant to the NFTA police office, the next question is whether the agents' conduct fell within the scope of a *Terry*-type detention. *U.S. v. Glover, supra,* 957 F.2d at 1011. I find that it did.

First, the agents had a legitimate reason for requesting the Defendant to accompany them to the NFTA office. Defendant had no identification, the telephone at the train station was in use, and they wished to verify his identity and the purpose of his travel (T1 at 46). The NFTA office was only a few blocks away.

Second, once the agents verified Defendant's identity, he was told that he was free to leave the office. He was also told that his great grandmother was unable to verify the reason for his trip to New York, and that his luggage would be detained pending a dog sniff. He was instructed on how to retrieve his luggage in the event that the dog sniff proved negative, signed a receipt, and left the terminal. The entire encounter lasted approximately thirty minutes.

Third, once Defendant had left, the officers immediately attempted to contact a narcotics-sniffing dog, who was unavailable. However, two dogs arrived within approximately one hour. Defendant's luggage was thus detained for approximately ninety minutes. In *United States v. Place,* 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), the Supreme Court held that a ninety-minute period was an unreasonable length of time for detention of luggage while waiting for a dog sniff. However, that finding was based at least in part on the lack of diligence of the investigating officers in arranging for the dog sniff (the officers had advance knowledge of the defendant's arrival at the airport, and could have arranged to have the dog present upon his arrival) and the failure of the officers to accurately inform the defendant about the procedures for retrieving his luggage. 462 U.S. at 709–10, 103 S.Ct. at 2645–46.

In this case, the officers had no advance notice of Defendant's arrival, and thus could not reasonably be expected to have had a trained narcotics-sniffing dog available at the time the New York City train arrived. They took immediate action to locate a dog once their identification procedures confirmed that Defendant was not giving them accurate information about his reasons for traveling to New York City. Further, as explained above, they specifically informed Defendant

about the procedure to retrieve his bags in the event the dog sniff was negative.

 Under all of these circumstances, I find that the officers acted diligently to confirm or dispel their suspicions, employing minimally intrusive means. The detention of Defendant for approximately thirty minutes to conduct brief questioning, and the detention of his bags for approximately ninety minutes to locate and await the arrival of a narcotics dog, was a limited intrusion on his Fourth Amendment interests justified by reasonable suspicion. Once the dogs positively alerted for the presence of narcotics in Defendant's bags, the officers had probable cause to obtain a search warrant.

Accordingly, I find that the officers' investigative stop of Defendant and his bags was a permissible *Terry*-type detention founded on reasonable suspicion that Defendant was engaged in drug trafficking activity, and that this detention did not ripen into a full-blown arrest when Defendant accompanied the officers to the NFTA terminal.

Based on the foregoing, it is my recommendation that Defendant's motion to suppress be denied.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED,** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 30(a)(3).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek, et al. v. Canadair Ltd., et al.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 30(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions of Rule 30(a)(3), or with the similar provisions of Rule 30(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.*

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to the attorneys for the Plaintiff and the Defendants.

**So Ordered.**

DATED: Buffalo, New York
February 22, 1993