**UNITED STATES of America,**
**Plaintiff,**

v.

**$60,020.00 UNITED STATES CURRENCY, Defendant.**

No. 08–CV–6286.

United States District Court,
W.D. New York.

Sept. 12, 2011.

Grace M. Carducci, U.S. Attorney's Office, Rochester, NY, for Plaintiff.

## DECISION AND ORDER

JONATHAN W. FELDMAN, United States Magistrate Judge.

### Preliminary Statement

Pursuant to 21 U.S.C. § 881(a)(6), the Government commenced this action *in rem* for the forfeiture of the sum of $60,020.00 in United States Currency seized from Claimant Joel Luke on January 12, 2008 at the Greater Rochester International Airport. The Court conducted a bench trial from October 12, 2010 through October 14,

2010.[1] Following the trial, the parties submitted further briefing, including supplemental proposed findings of fact and conclusions of law. Pursuant to Rule 52 of the Federal Rules of Civil Procedure, the Court hereby makes the following findings of fact and conclusions of law.

### Findings of Fact

For the most part, the relevant events of January 12, 2008 are not in dispute. What is in dispute are the conclusions which may logically be drawn from those facts. On January 12, 2008, Joel Luke was scheduled to take a flight on Delta Airlines from Rochester, New York to Atlanta, Georgia. Luke obtained his ticket through a one way "buddy pass" that he received from Mr. Desery Davis, a Delta Air Lines employee. Luke had never met Mr. Davis in person, but testified that Davis was a mutual friend of Ms. Passionate Gerard, who had arranged for Davis to give the pass to Luke. Luke's flight to Atlanta was scheduled to depart at 6:00 a.m. so he arrived at the airport shortly before 5:00 a.m.

At approximately 5:00 a.m. on January 12th, Luke attempted to pass through security at the Rochester airport. Luke placed his personal property, including his laptop computer, belt and shoes in a plastic bin and placed the bin on the conveyor belt to pass through x-ray screening. Luke then walked towards the magnetometer for screening. Security screening at the Rochester International Airport is contracted to McNeil Security. After going through the magnetometer without incident, Luke was approached by Bruce Hopkins who was employed by McNeil as a Transportation Security Officer. Hopkins was conducting an additional layer of random screening known as "continuous random screening." Officer Hopkins informed Luke that he was being selected

---

1. In accordance with the provisions of 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of this Court for all dispositive matters. (Docket # 13).

for continuous random screening which included a "pat down." Luke did not object to the additional security check or the "pat down" search.

Prior to conducting the pat down, Officer Hopkins asked Luke to remove everything from his pockets. Hopkins then conducted the pat down search, starting with the shoulders and working down towards Luke's feet. When Hopkins reached Luke's left leg area, he felt a bulge in his pocket. Hopkins testified it felt hard and was brick-like. Officer Hopkins asked Luke what the object was and Luke responded that it was "a book." Officer Hopkins asked Luke to remove the book so that it could be placed through x-ray screening. Luke then removed two "bricks of money" that were wrapped, taped and bound in rubber bands from his left leg pocket and placed them into a gray bin. Upon seeing what appeared to be a large amount of cash, Officer Hopkins called for his supervisor and then continued with the pat down of Luke. When patting down Luke's right leg, Hopkins felt another object in Luke's pants pocket which he asked Luke to remove. Luke removed two more stacks of money and placed them into the gray bin. Luke was then asked to accompany McNeil employees to a private security area for further screening. Luke asked if he would be able to catch his flight, but was told he would have to go through further screening before he would be cleared to go to his departure gate. Luke and his belongings, including the four bundles of cash, were escorted to the private screening area.

Monroe County Sheriff's Deputy Kenneth Carpenter was on-duty that morning at the airport. Shortly after 5:00 a.m. Carpenter was advised that a passenger had attempted to go through security while carrying on his person a large amount of cash. Deputy Carpenter was asked to meet the passenger at the private screening area at which time he assumed control over the investigation. Carpenter testified that based on his training and experience a large amount of money coming through an airport could be an indication of drug trafficking. After reviewing Luke's drivers license, Deputy Carpenter asked Luke where he was going. Luke responded that he was traveling to Atlanta, Georgia to meet a friend and attend an automobile auction. Carpenter asked Luke where the auction was located, and Luke responded that he did not know. Carpenter asked Luke how much money he had on him, and Luke responded $50,000.00. Carpenter advised Luke that based on his travel to Atlanta on a one way ticket with no checked luggage, little "carry-on" baggage, and the fact that he was unable to state where the auction was being held, Carpenter was going to have to request further investigation.[2] Carpenter told Luke that he would not be able to depart on his scheduled flight, but that he would be able to fly to Atlanta later that day. Carpenter then notified his supervisor, Sergeant Mark Jenis, of the situation and escorted Luke to the satellite Sheriff's Office at the airport. Luke was instructed to put the money in a black carry-on bag he had with him. Luke placed the money in the black bag and carried the bag as he went with Carpenter.

Carpenter's suspicions about the money were further aroused as he chatted with Luke on their walk to the Sheriff's Office. Carpenter testified that he asked Luke what the source of the money was and Luke stated that he owned a store on Hudson Avenue in the City of Rochester where he sold shoes and that he also sold

2. Carpenter also testified he believed Luke was being "deceitful" with the secondary screening officers when he told them that the lump in his pocket was a "book."

cars. Luke explained to Carpenter that he was in debt and that he did not use banks to keep his money because his assets had been frozen. Upon arrival at the satellite office, Carpenter sat with Luke until Sergeant Jenis arrived shortly before 6:00 a.m. After getting briefed by Officer Carpenter on the status of the investigation, Sergeant Jenis decided to call in additional investigative resources. Jenis contacted Sergeant Stephen Ryan and Canine Unit Supervisor Sergeant Paul Vadas and requested that they come to the airport. Due to the early morning hour, Jenis had to leave a voice mail message for Vadas, the canine handler. Jenis decided not to question Luke himself, but await the arrival of the additional investigative resources.

Canine Unit Supervisor Sergeant Paul Vadas was the first to arrive at the airport. Vadas recalls being called at home by Sergeant Jenis at approximately 6:00 a.m., but could not recall the specific time he arrived at the airport. Jenis testified that Sergeant Vadas and his dog "Odie" arrived 30 to 45 minutes after he called him. When he arrived at the airport, other officers had already prepared for Odie's search process.[3] The currency found on Luke had been placed in a black bag and then set down in an office off a hallway near the kitchen area of the Sheriff's airport satellite office. Vadas brought Odie to the kitchen and told him to begin the search. Odie then went through the kitchen and down the hall without alerting. When Odie got to the office he alerted to the black bag containing the currency which

was on the floor of the office. Vadas testified that the Odie's "search" took five minutes and ended at 6:53 a.m. Odie was given a "reward" and placed back in Vadas's patrol car.

After Odie alerted on the black bag, Sergeant Jenis assisted in counting Luke's money. In total there was $60,020.00, over half of which was comprised by 1608 twenty dollar bills. Sergeant Jenis informed Luke that he would not be able to leave with his money. Meanwhile, Sergeant Stephen Ryan, a member of the Greater Rochester Area Narcotics Enforcement Team, arrived after Odie and the Canine Unit left. Sergeant Ryan approached Luke and asked if he had any receipts for the money to show it belonged to him such as a bank receipt or a bank book with a withdrawal confirmation. Luke responded that he did not have any receipts because he did not use banks because his accounts were frozen. Ryan testified that Luke was present when the money was counted. The currency was put in a plastic evidence bag and Luke was given a receipt. Luke was never restrained or told he was under arrest. After receiving the receipt, Luke left the Sheriff's office.

Sometime after the seizure of the money by the Sheriff's Office, the currency was delivered to the United States Drug Enforcement Administration (DEA) for initiation of civil forfeiture proceedings. DEA Special Agent David Zon testified that he received a call from attorney Vincent Merante who stated he was representing Luke with regard to the seizure at the airport

---

**3.** Vadas testified that Odie was certified by examiners from the New York State Police as qualified in narcotics detection after completing 240 hours of training. Odie is required to participate in "maintenance training" and is continually tested in narcotics detection proficiency. Odie is not trained to alert to currency but rather the odor of illegal narcotics. When Odie detects the odor of cocaine, he is trained to alert on the area where the cocaine scent is found by scratching, biting and barking at the specific location where the odor is coming from. According to Vadas, Odie has been involved in over 100 searches and is considered to be reliable based on his performance in his training sessions as well as his performance in the field.

and wanted to know how Luke could get the return of his money. Agent Zon told Merante that if Luke could produce documentation as to the source of the money there was a "possibility" it could be returned.

On February 7, 2008, Luke and Merante went to Agent Zon's office to discuss the seizure. According to Zon, Merante "dumped a bunch of papers" onto a conference table and said they brought "receipts to verify where all the money came from." Merante advised Zon that Zon could not ask questions directly of Luke but was permitted to look at the "receipts." According to Agent Zon, the documentation consisted of a variety of papers, ranging from handwritten notations with no dates on them to various tax records. Zon asked Merante what business Luke was in and, with Merante's approval, Luke began to answer Zon's questions. Luke told Zon that he sold t-shirts and tennis shoes but did not know how much money he made from the sales. Luke said the shirts cost $15 or $20 dollars a piece, but he did not know how many he sold and had no receipts. Luke told Zon his bank accounts were frozen due to a credit card debt. Luke also said he worked for a snack distributer at one time and also had a part-time job as a greeter at Walmart. Luke also showed Zon an undated, handwritten receipt for a Yukon Denali SUV. At the conclusion of their meeting Agent Zon told Merante and Luke that he would examine their documentation and get back to them, but it was possible that the money would not be returned.

During the trial the Government presented expert evidence regarding the significance of the positive alert by Odie. Dr. Kenneth Furton, a Professor of Chemistry and Biochemistry at Florida International University, testified without objection as an expert in the field of analytical chemis-try, forensic science and canine detection. Dr. Furton explained that based on their acute sense of smell dogs can be trained to alert when they detect the unique odor of a chemical found in a particular drug. In the case of cocaine, the dominant odorous chemical is methyl benzoate. According to Dr. Furton, one of the characteristics of methyl benzoate is that the odor that can be detected by the canine dissipates relatively quickly, usually in a matter of hours. With respect to United States currency, Dr. Furton stated that while ninety percent of all currency in circulation is contaminated with trace amounts of cocaine, it is physiologically impossible for a dog to detect such contamination. Dr. Furton explained that this is because the animal is not smelling cocaine, but a single volatile chemical associated with cocaine—methyl benzoate. Once the currency is separated from the cocaine, the methyl benzoate odor dissipates fairly quickly and although trace amounts of cocaine remain on the currency, the odor of methyl benzoate does not. However, if the currency was recently contaminated by cocaine and a trained dog is around the recently contaminated currency, the dog will alert to the currency.

As to this case, Dr. Furton testified that he reviewed the training and proficiency of Odie and was of the opinion that Odie is an extremely accurate drug detection canine. Based on Odie's training and historical proficiency in detecting narcotics, Dr. Furton opined that "the currency in question either recently or just before packaging had a significant amount of narcotic odor present and is not the result of innocent environmental contamination by microscopic amounts of cocaine residue." As to whether other substances contain methyl benzoate, Dr. Furton agreed that certain colognes, perfumes and skin lotions do contain small amounts of the chemical. However, Dr. Furton testified that research has shown the concentrations of

methyl benzoate in these products is below the threshold required for a dog to detect the scent of methyl benzoate, thus eliminating the possibility of a false positive alert to money that had recently been exposed to one of these products. Dr. Furton testified that "we have not found any over-the-counter item that contains sufficient amounts of methyl benzoate that you could elicit an alert by a detection canine."

The Government also presented evidence concerning Luke's income and expenses. Tax returns produced by Luke during discovery reported income of $21,911.00 in 2005, $13,158.00 in 2006, and $28,860.00 in 2007. A government analysis of plaintiff's income and expenses for the years 2006 to 2008 revealed that Luke's expenditures exceeded his income by over $30,000.00.

The defense called three witnesses. The first, Jason Busch, testified that in mid-summer 2007 he bought a car from Luke for $27,000.00. Busch used money orders to pay for the car. The second, Michael Casserino testified that he was a friend of Luke and was self-employed as a used car dealer. Casserino stated he has known Luke for over a decade and Luke had invested some money in Casserino's used car business. In addition, Luke was authorized to attend automobile auctions and purchase vehicles as an agent for Casserino's dealership. Casserino testified that at or around the time that Luke had been stopped at the airport he recalled talking to Luke about buying cars from Southern States. However, Casserino admitted that he never spoke to Luke about a specific auction in Atlanta prior to January 12, 2008 and he was not aware that Luke was traveling to Atlanta on January 12, 2008 to attend an automobile auction. It must be noted that Mr. Casserino's credibility was impeached when the Government confront-ed Casserino with material inconsistent statements he previously made in a signed affidavit submitted in support of Luke's efforts to gain return of the seized currency. Indeed, Casserino admitted to making statements in his affidavit that were not true.

The final witness was Joel Luke. As to the events of January 12, 2008 at the airport and the seizure of the currency he was carrying, Luke's testimony was generally consistent with the recollections of the Government's law enforcement witnesses. However, as to another critical issue before the Court, the source of the currency he was carrying, Luke did not help his case. The Court will not recount all the details of Luke's testimony. Suffice it to say, Luke reiterated the strange and varied explanations he had given as to his income and the source of the money he was carrying that morning. As in any trial, the finder of fact must make credibility determinations in evaluating whether to believe the witness's testimony. The Court's sense from listening to Mr. Luke's testimony was that his ability and willingness to provide informative and reasonably responsive answers to questions markedly changed when the questions moved from what happened on the morning of January 12, 2008 to questions concerning his finances, his income and the source of the seized currency. As to the latter topics, the Court found Luke to be deliberately vague and evasive, particularly when challenged on some aspects of his finances. For example, Luke insists that the seized funds represents his "life savings" and that he "absolutely" knew how much money was on his person when he went to the airport. Yet, when asked by law enforcement at the airport how much money was in the two "books" of cash they found in his pockets he told them $50,000.00. When asked by law enforcement why he would keep so much money in cash, Luke

explained that he did not use banks because "all his assets were frozen." Yet, bank records show Luke had active accounts with banking transactions (deposits and withdrawals) and no evidence of any limitation or freeze on the accounts. The oddity of someone maintaining an active bank account, yet choosing to keep his "life savings" (most of it in $20 bills) in a dresser drawer is not lost on this Court. Luke testified that he was going to Atlanta on January 12, 2008 to use the cash to buy cars at an auction, yet did not know if there were any auctions scheduled in Atlanta on August 12th, 13th or 14th.

In addition, the reliability of the financial evidence Luke produced was particularly suspect. After the money had been seized and before meeting with Agent Zon, Luke created records purportedly documenting details of the sale of the vehicle to Busch which allegedly occurred in 2007. Particularly problematic to the Court was Luke's testimony regarding copies of tax returns he produced. Luke produced a tax return for 2006 in which he claimed a federal refund of $6,625.00 yet his bank records document a federal tax refund of only $967.45. The 2006 return was "signed" by Luke and "Michael Casserio" as the return's "preparer." Luke testified that Michael Casserio is *not* Michael Casserino and he had no idea who Michael Casserio is. Luke stated that the 2006 federal tax return exhibit came from his own personal records but "really can't explain" who Casserio is and how his signature got on the tax returns. Luke's evasiveness and lack of credibility on issues regarding his own personal financial records tainted his overall credibility.

Notwithstanding the problems with Luke's credibility, in the final analysis the issue for the Court to decide is not whether Luke has been truthful about the source of the seized money, but whether the Government has sustained its burden of proving it is more likely than not that the seized funds were substantially connected to narcotics trafficking. Accordingly, the Court turns next to the admissibility of the most compelling evidence of such a connection.

### Luke's Motion to Suppress

 Luke has moved to suppress the canine alert to the currency seized from his person on January 12, 2008. If the alert by Odie was obtained in violation of Luke's Fourth Amendment rights, then the Court may not consider Odie's positive alert to the presence of narcotics on the currency in deciding whether the Government has sustained its burden in proving a legitimate forfeiture.

In moving to suppress, Luke does not seriously challenge the legality of the Government's initial decision to detain him and his property, but rather the length of the detention. Luke's apparent concession as to the constitutional legitimacy of his initial detention at the airport is appropriate. The testimony adduced at the trial supports the Government's justification of the stop of Luke. The behavior of Luke which resulted in the discovery of a large amount of cash in his pockets and his odd explanations when asked about the source and purpose of the cash provided an objective basis for an investigatory stop and initial seizure of Luke and the currency he was carrying. *Terry v. Ohio,* 392 U.S. 1, 22, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) ("[A] police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest.").

The crux of Luke's suppression argument here is that the length of the stop and seizure transformed what was a legitimate investigatory stop into an illegal sei-

zure of his property. *See* Claimant's Proposed Findings of Fact and Conclusions of Law (Docket # 42) at p. 22 ("[T]he length of the detention itself makes the seizure unreasonable."). According to Luke, the legitimate *Terry* stop ripened into an unconstitutional seizure well before Odie arrived on the scene and accordingly the canine's positive alert to the presence of narcotics on the seized currency is inadmissible as evidence that links Luke's currency to illegal narcotics trafficking. In making this "elapsed time" argument Luke relies predominantly, if not solely, on the Supreme Court's decision in *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) where the Court held that the Fourth Amendment principles established in *Terry v. Ohio* apply to the warrantless seizures of personal luggage in the custody of a traveler. As in the stop and seizure of a person, so long as the seizure of the luggage was supported by a reasonable belief premised on specific and objective facts that the luggage contained contraband or evidence of a crime then the luggage may be temporarily seized for pursuing a limited course of investigation. *Place*, 462 U.S. at 702, 103 S.Ct. 2637.

At first blush, the *Place* decision appears to support Luke's elapsed time arguments. In *Place*, law enforcement agents were suspicious of the behavior of Raymond Place, a traveler who was flying from Miami to New York City. Although Mr. Place consented to the search of his checked bags, because his flight to New York was about to depart the officers decided not to search the luggage. After finding some further discrepancies in the address tags attached to the luggage, law enforcement called DEA agents in New York City to relay their suspicions. Upon de-boarding at New York's LaGuardia airport, DEA agents stopped Mr. Place and told him they suspected he might be transporting narcotics. After Mr. Place refused to consent to a search of his luggage, the agents told him that they were going to take the luggage to a federal judge and apply for a search warrant. Instead, the agents transported the luggage to Kennedy Airport in New York City where a drug detention dog positively alerted to one of Mr. Place's bags. The agents then applied for and obtained a search warrant and found cocaine in the luggage. The time between the seizure of the luggage in New York and the positive canine alert was ninety minutes. In finding the seizure of Mr. Place's luggage to violate the Fourth Amendment the Court held:

> The length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause. Although we have recognized the reasonableness of seizures longer than the momentary ones involved in *Terry*, ... the brevity of the invasion of the individual's Fourth Amendment interests is an important factor in determining whether the seizure is so minimally intrusive as to be justifiable on reasonable suspicion. Moreover, in assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation. We note that here the New York agents knew the time of Place's scheduled arrival at LaGuardia, had ample time to arrange for their additional investigation at that location, and thereby could have minimized the intrusion on respondent's Fourth Amendment interests. Thus, although we decline to adopt any outside time limitation for a permissible *Terry* stop, we have never approved a seizure of the person for the prolonged 90–minute period involved here and cannot do so on the facts presented by this case.

*Place*, 462 U.S. at 709–10, 103 S.Ct. 2637 (emphasis added)(internal citations and footnotes omitted).

Relying on the underlined first sentence quoted above, Luke forcefully argues that if the *Place* holding means anything, it means that any *Terry* based seizure of luggage from a traveler that lasts longer than ninety minutes is unreasonable *per se* under the Fourth Amendment. And, looking at that sentence in isolation, one could reasonably agree with Luke's argument. However, as the Government points out, post-*Place* cases have clarified that the Court was *not* establishing a bright line rule that a *Terry* stop exceeding ninety minutes automatically violates the Fourth Amendment. Indeed, two years after *Place*, the Supreme Court revisited the issue of establishing duration limits to investigatory stops in *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). Although the detention at issue in *Sharpe* was less than ninety minutes, the Court directly rejected establishing rules which contain bright line or *per se* time limits. In reviewing its *Place* holding, the Court in *Sharpe* stated:

> In [*Place*], law enforcement agents stopped the defendant after his arrival in an airport and seized his luggage for 90 minutes to take it to a narcotics detection dog for a "sniff test." We decided that an investigative seizure of personal property could be justified under the *Terry* doctrine, but that "[t]he length of the detention of respondent's luggage alone precludes the conclusion that the seizure was reasonable in the absence of probable cause." *However, the rationale underlying that conclusion was premised on the fact that the police knew of respondent's arrival time for several hours beforehand, and the Court assumed that the police could have arranged for a trained narcotics dog in advance and thus avoided the necessity of holding respondent's luggage for 90 minutes. "[I]n assessing the effect of the length of the detention, we take into account whether the police diligently pursue their investigation."*

*Sharpe*, 470 U.S. at 684–85, 105 S.Ct. 1568 (emphasis added)(internal citation omitted). The Court explained that at some point an investigative stop no longer can be considered an investigative stop if it continues indefinitely, but that the duration of the stop is just one factor, albeit an important factor, in determining how long is too long under the Fourth Amendment. In addition to the elapsed time, courts must also consider (1) the law enforcement purposes served by the stop, (2) the time needed to reasonably effectuate those purposes, and (3) "whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* at 686, 105 S.Ct. 1568. The Court stated that its *Place* holding "expressly rejected" a "hard-and-fast time limit for a permissible *Terry* stop" and concluded that "[m]uch as a 'bright line' rule would be desirable, in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *Sharpe*, 470 U.S. at 685–86.

Cases decided after *Place* and *Sharpe* confirm this flexible "totality of circumstances" approach. *See, e.g., United States v. Donnelly*, 475 F.3d 946, 953 (8th Cir.2007)("Although the Supreme Court in *Place* did declare unreasonable the police's seizure of a suspected drug trafficker's luggage for 90 minutes so that it could be taken to another airport for a dog-sniff, the decision turned more on the unnecessary nature of the delay than on its duration."); *United States v. Maltais*, 403 F.3d 550, 557–58 (8th Cir.2005)(delay in excess of ninety minutes to arrange for arrival of "drug dog" reasonable under the circumstances and not violative of *Place* ); *Unit-*

ed States v. Frost, 999 F.2d 737, 742 (3d Cir.1993)(while language in Place "does emphasize the amount of time that elapsed between seizure and sniff," Place rejected an approach that focuses solely on the elapsed time; eighty minute delay held to be reasonable under the circumstances); United States v. Woods 837 F.Supp. 525, 529 (W.D.N.Y.1993)(ninety minute detention of luggage to await arrival of narcotics sniffing dog not unreasonable under Place ).

When viewed in the context of overall reasonableness and not simply the duration of the detention alone, I conclude that the delay of ninety minutes or so to await the arrival of Odie was reasonable under the Fourth Amendment. Unlike the facts of Place where the actions of the DEA demonstrated a lack of diligence, the actions of law enforcement here reflected an immediate effort to conduct their investigation of the seized property and determine whether they had a basis to retain it. Within minutes after being summoned to the secondary screening area at the airport, Monroe County Sheriff Deputy Kenneth Carpenter met Luke, assessed the situation regarding the discovery of the two bundled bricks of currency and notified his supervisor Sergeant Mark Jenis. Carpenter briefed Jenis who immediately made the decision to call in additional resources relevant to narcotics investigations—one of whom, Sergeant Vadas, was the handler of Odie. Because of the early hour, Jenis paged Vadas and also left a message on his cell phone. Vadas recalls receiving Jenis's call at home at approximately 6:00 a.m. After receiving the call, Vadas drove to the airport with Odie. Vadas and Odie arrived at the airport and their search was completed by 6:53 a.m. Thus, less than an hour after being called at home by Jenis, Vadas had driven to the airport and had Odie complete the narcotic detection search.

Unlike Place, the time line here supports a finding that given the particular circumstances they were presented with, "the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly." Sharpe, 470 U.S. at 686, 105 S.Ct. 1568. Luke has not argued that a trained canine like Odie could have or should have arrived at the airport earlier. "The constitutional prohibition against unreasonable seizures does not require law enforcement officials, at considerable public expense, to maintain specialized personnel and equipment at remote locations at all hours of the day and night, or to forgo the timely investigation of serious offenses as to which they have reasonable, articulable suspicion." Donnelly, 475 F.3d at 954 (internal quotation and citation omitted); see Frost, 999 F.2d at 742 ("We find that none of the indicia of a lack of diligence, which substantially informed the result in Place, occurred in the instant case."). For all these reasons I conclude that the detention of Luke's property was reasonable under the specific circumstances presented on the morning of January 12, 2008. Accordingly, Luke's motion to suppress the results of the canine drug detention procedure is denied.

### Forfeiture of Currency

■ The Court now turns to the proof regarding the Government's efforts to forfeit the currency seized from Luke at the airport. 21 U.S.C. § 881(a)(6) permits forfeiture to the Government of:

[a]ll moneys, negotiable instruments, securities, or other things of value furnished or intended to be furnished by any person in exchange for a controlled substance or listed chemical in violation of this subchapter, all proceeds traceable to such an exchange, and all moneys, negotiable instruments, and securities

used or intended to be used to facilitate any violation of this subchapter.

Pursuant to the Civil Asset Forfeiture Reform Act of 2000 (CAFRA), the Government must "establish, by a preponderance of the evidence, that the property is subject to forfeiture." 18 U.S.C. § 983(c)(1). "When the Government seeks forfeiture, pursuant to 21 U.S.C. § 881(a)(6), on a theory that property constitutes proceeds traceable to an exchange for narcotics, it need not prove that there is a substantial connection between the property and any specific drug transaction. Instead, the Government may prove more generally, based on a totality of the circumstances, that the property is substantially connected to narcotics trafficking." *United States v. Currency in Sum of One Hundred Eighty–Five Thousand Dollars ($185,000)*, 455 F.Supp.2d 145, 149 (E.D.N.Y.2006)(internal citation omitted). In satisfying its burden of proof, "the [G]overnment may rely upon any evidence it has lawfully obtained up to the time of the forfeiture trial." *United States v. $557,933.89*, 287 F.3d 66, 89 (2d Cir.2002).

█ Although a close question, and one which the Court would have answered differently had the burden of proof applicable to criminal cases been the standard, I find that the Government has demonstrated by a preponderance of the evidence that the currency seized from Luke was substantially connected to narcotics trafficking. This finding is not based on any one factor, but the totality of the evidence presented.

I start with the amount and denominations of the money Luke was attempting to carry through the magnetometer. Luke was an experienced traveler and the admonition to "empty your pockets of everything" before going through the magnetometer is now a routine and well known requirement of air travel. Luke chose not to follow the requirement and, when asked what the bulge in his pocket was, responded "a book." Of course, it was not a book, but a large wad of carefully packaged cash and Luke's explanation that he was referring to a "book of cash" simply does not ring true to the Court. Once the cash was found, Luke deliberately misstated the amount as $50,000.00 when he knew it was more than that. Upon counting the money, law enforcement determined that over half of the currency was comprised of twenty dollar bills, a denomination commonly used in drug transactions. The possession of a large amount of money is a factor to be included in the overall totality of the circumstances surrounding a probable cause determination. *United States v. $2,500 in U.S. Currency*, 689 F.2d 10, 16 (2d Cir.1982). *See also United States v. Certain Real Prop. & Premises Known as 63–29 Trimble Rd.*, 812 F.Supp. 335, 338 (E.D.N.Y.1993)("It is settled law that possession of large amounts of unexplained cash is evidence of narcotics trafficking activities."); *United States v. $175,260*, 741 F.Supp. 45, 47 (E.D.N.Y.1990)(carrying large amounts of currency may support an inference that the money is related to drug trafficking). Although Luke testified he was going to Atlanta to pursue his car buying business, the manner in which the cash was bundled or "wrapped" in stacks secured by rubber bands in various denominations is also a factor suggesting it had a less than legal source. *See United States v. $242,484.00*, 389 F.3d 1149, 1161–62 (4th Cir.2004)(Fact that bundles of money were nonuniform and wrapped in rubberbands in various denominations without bank wrappers was "indicative of a drug organization bundling money."). In addition, throughout the investigation and even during the trial, Luke provided conflicting, inconsistent, vague and sometimes evasive answers and explanations as to how much money he was carrying, the origin of the money, what auctions he was

attending, where and when those auctions were being held and his connections to Atlanta. *See United States v. $215,300 U.S. Currency,* 882 F.2d 417, 419 (9th Cir.1989)(inference that money was drug-related supported when traveler tried to avoid detection by concealing currency and lying to law enforcement).

The Government's financial evidence also supported an inference of an illegal source of income. Put simply, Luke's limited income stream as set forth in his personal tax returns renders it improbable that he could amass over $60,000.00 from legitimate sources. The veracity of the tax returns were themselves open to question as Luke's explanation of how a strange signature appeared on his tax return was frankly not worthy of belief and tainted the rest of his testimony. The Court was also skeptical of Luke's explanation as to why he kept tens of thousands of dollars in his bedroom dresser. His claimed aversion to banks because his accounts had been frozen was inconsistent with his active use of bank accounts that had no apparent restrictions, freezes or holds.

The foregoing circumstances suggest that Luke was involved in some illegal activity. However, there must also be a nexus specifically linking the incriminating circumstances to illegal drugs for the government to prevail. The testimony of Sergeant Vadas and Dr. Kenneth Furton provided the necessary link. Although not relied on by Luke, this Court is aware of differing views as to the evidentiary significance of a dog alert to United States currency. *See, e.g., United States v. Ten Thousand Seven Hundred Dollars and No Cents ($10,700.00) in U.S. Currency,* 258 F.3d 215, 230 (3rd Cir.2001)("We note, however, that several of our sister circuits recently have called into question the evidentiary significance of a positive reaction to currency in determining whether there

is probable cause to forfeit the money in light of studies indicating that a large percentage of United States currency is contaminated with sufficient traces of drug residue to cause a canine to 'alert' to it."); *United States v. U.S. Currency, $30,060.00,* 39 F.3d 1039, 1041–42 (9th Cir.1994)("In recent years, however, subsequent courts, including our own, have questioned the probative value of positive dog alerts due to the contamination of America's paper money supply with narcotics residue.")(collecting cases).

Here, however, Odie's alert was not to the presence of contamination on the currency Luke was carrying, but rather to the odor of methyl benzoate, a chemical byproduct of cocaine. These more sophisticated dog alerts have been given greater weight because they indicate that the subject currency has been in recent contact with illegal drugs. "[I]f dogs alert to methyl benzoate as opposed to cocaine per se, and the byproduct is volatile enough to evaporate from the currency within a short period, then a dog alert likely would be more probative because even assuming that most currency is tainted with particles of cocaine, dogs will not alert to it unless it contains the odor of methyl benzoate." *United States v. Funds in Amount of Thirty Thousand Six Hundred Seventy Dollars ($30,670.00),* 403 F.3d 448, 455, 459 (7th Cir.2005)(analyzing the empirical evidence regarding dog alerts to United States currency and adopting the expert opinion of Dr. Furton that a "properly trained dog's alert to currency should be entitled to probative weight"). *See United States v. $22,474.00 in U.S. Currency,* 246 F.3d 1212, 1216 (9th Cir.2001)(where evidence was that dog would not alert to cocaine residue found on currency in general circulation but rather was trained to alert to the odor of methyl benzoate, court could infer that the subject currency had recently been in the proximity of cocaine).

In this case the expertise of Dr. Furton was not disputed by Luke. Nor was Odie's training and historical proficiency in detecting the odor of illegal narcotics. Moreover, Dr. Furton's expert opinion that Odie's alert to the currency Luke was carrying confirms that the currency had been in recent contact with illegal drugs was not effectively impeached. Although not required, Luke presented no countervailing expert evidence for the Court to consider. In sum, the Court found Dr. Furton's expert testimony to be grounded in valid science and reliably tested in the field. His opinion that an alert by a properly trained dog like Odie is probative evidence that currency has recently been in close proximity to an illegal narcotic was credible and persuasive. When considering Dr. Furton's opinion along with the totality of the other circumstances present here, the Court finds that the Government has proven by a preponderance of the evidence that the currency Luke was carrying on January 12, 2008 was substantially connected to narcotics trafficking.

### Conclusion

The Government's forfeiture application is **granted.** The defendant currency is ordered condemned and forfeited to the United States of America for disposition in accordance with the law.

SO ORDERED.